THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. JAMES JAMISON, DEFENDANT-APPELLANT.

Argued November 21, 1973—Decided March 5, 1974.

*Mr. Gerald P. Boswell,* Assistant Deputy Public Defender, argued the cause for appellant (*Mr. Stanley C. Van Ness,* Public Defender, attorney).

*Mr. Elson P. Kendall,* Assistant Prosecutor, argued the cause for respondent (*Mr. Karl Asch,* Union County Prosecutor, attorney).

The opinion of the Court was delivered by

CONFORD, P. J. A. D., Temporarily Assigned. Defendant was convicted of atrocious assault and battery, assault with an offensive instrument and possession of a dangerous knife. He was sentenced to from five to seven years in prison on each count, the terms on the last two counts to be served concurrently, but consecutively to the term on the first count. The Appellate Division affirmed in an unreported opinion. We granted certification, 63 *N. J.* 567 (1973). We were concerned over a possible injustice in the failure of adduction at the trial: (a) of the fact that another person had prior to trial confessed under oath before the trial judge that he, not the defendant, had committed the crimes; or (b) of direct testimony by that person that he rather than defendant committed the crimes. We find such an injustice in the case and deem it substantial enough to warrant a reversal and direction for a new trial.

The incident giving rise to this prosecution grew out of an altercation between the victim, one Michael Nigro, and a party of four persons consisting of defendant, his cousin Sylvester Roseboro, his brother-in-law Alexander Durham, and his girl friend Patricia Naylor, in the very early morning of September 5, 1971 in Elizabeth. The defendant accosted Nigro as he sat in his parked car and asked for a ride for the group, defendant's version being that they wanted transportation to a restaurant, that he agreed to pay Nigro two dollars for the ride, and that all four got into the car. Nigro testified he refused the ride but all four got into the car nevertheless. When he persisted in his refusal he was

pulled onto the sidewalk and punched in the face by defendant and one of the other men. He saw defendant take out a knife and he ran, whereupon he was stabbed twice, once in the shoulder and once in the hip. Another prosecution witness also testified he saw defendant pursuing Nigro with a knife. The victim was severely injured and required a colostomy.

Defendant testified that as he was about to pay Nigro the two dollars Roseboro said it was too much and Nigro ordered them all from the car. He then saw Roseboro and Nigro arguing on the sidewalk and begin exchanging blows. Roseboro suddenly stabbed Nigro with a knife. Defendant grabbed Roseboro's arm, took the knife away from him and put it in his own pocket. All four ran away, defendant going to the home of his aunt, Roseboro's mother, to await the others. Miss Naylor substantially corroborated defendant's version of the incident. Durham was not called at the trial because he cou'd not be found. Roseboro's involvement with the trial is discussed *infra*.

Roseboro, Durham and Naylor were apprehended by the police not far from the scene and brought to the hospital where Nigro was being treated. According to one of the arresting officers, Nigro stated that the three were part of the group involved in the incident but that the one that stabbed him was missing. According to Naylor, Nigro identified Durham as the person who attacked him with the knife.

When informed at the hospital that the group would have to go to police headquarters, Roseboro became upset and told the police that his cousin was the assailant. The police proceeded to Roseboro's house and apprehended defendant with a knife in his jacket pocket. The knife was later determined to have traces of blood on it. Defendant was taken to the hospital where, according to the arresting officer, he was identified by the victim as the man who had stabbed him. Defendant, however, testified that when Nigro was asked if defendant was the one who knifed him, he replied, "No. He's one of them."

At headquarters defendant gave the police a statement, which he refused to sign, indicating that Roseboro was the assailant. Roseboro provided a statement inculpating defendant. Durham told the police that he did not see any knife but did see defendant hit Nigro "a few licks" and then observed blood on Nigro's jacket as defendant chased him. Patricia Naylor gave a statement in which she said she did not see anything happen at all; but she testified that not everything she had told the police was contained in the statement and that she had informed them that the knife they found was Roseboro's and that Roseboro had done the stabbing.

There was conflicting testimony as to the degree of illumination on the dark street at the time of the occurrence. Jamison and his companions were young blacks, all the males with "Afro" hairstyles. The testimony most supportive of defendant's version of the incident concerned his and Roseboro's clothing. Nigro testified repeatedly and emphatically that his assailant was not wearing a suit but a brown or maroon sweater with a white line. However, all of the other relevant testimony elicited at the trial, including that of the arresting officer, was that defendant was wearing a suit. He appeared to have worn matching pants and jacket, a shirt, perhaps a tie, but no sweater. Defendant and Naylor testified that Roseboro wore no suit, but a sweater, described by defendant as a brown sweater with a white stripe.

During a recess while the trial jury was being chosen on February 14, 1972 counsel for the defendant and the assistant prosecutor asked the judge for a special hearing. This was prompted by the fact, as related to the court by the defense attorney, that he and the assistant prosecutor were approached that morning by Roseboro, who had been designated by the defense as a potential defense witness, with the information that Roseboro intended to take the witness stand and testify that he, not the defendant, had stabbed Nigro. He was said to have told them: "I don't want to see someone blamed for something I did." The judge was told that Roseboro, in the presence of a deputy sheriff, was promptly

informed by the attorney and the assistant prosecutor of his constitutional rights under the *Miranda* case; and that he still wished to come forward voluntarily and testify to the stated effect. The judge was further told that no coercion was used on Roseboro, that he was intelligent and had a high school education and that the attorneys had felt that they should bring Roseboro before the court "in the interest of justice".

The judge then addressed Roseboro, who was first sworn, stating that before asking any questions he "[wished], of course, to see that you have independent counsel". The judge noted (a) that the charge against Jamison was serious; (b) his understanding that Roseboro wished to enter a plea of guilty, had confessed to the offenses, and asserted Jamison's innocence; (c) although wanting the truth, his desire not to have an innocent person "pleading to something he did not do" and (d) the necessity for counsel prior to entry of a plea. Roseboro told the judge: "Everybody have a mind to speak, you know, how they feel."

The court then elicited affirmative responses from Roseboro as to the fact that he had previously given a statement to the prosecutor naming Jamison as the perpetrator and as to his understanding that a plea of guilty or a contrary statement under oath would be false swearing. Roseboro further answered in the affirmative questions from the court as to whether it was his desire to plead guilty and whether he had told the truth when he told the attorneys that he (Roseboro), and not Jamison, had committed the acts in question. Roseboro also responded in the affirmative to questions by the judge with regard to whether he was fully informed (a) that his statements would be used against him; (b) that he had a right to assigned counsel; (c) that he had a right to remain silent; and (d) that he could receive 21 years for the offenses and would "probably" be so sentenced if before this judge. The judge again informed Roseboro that he should have the benefit of counsel before entering a guilty plea and he di-

rected that a public defender come to the courthouse at once to advise Roseboro.

After a recess, the assistant public defender designated to represent Roseboro, a Mr. Hansen, told the judge that after conferring with him Roseboro was retracting his former statement to the court, was denying any part in the stabbing, and was stating that his prior remarks to the court were not the truth. Thereafter, the judge directed the assistant prosecutor to investigate possible obstruction of justice and false swearing by Roseboro and to bring these matters to the attention of the grand jury if necessary.

At the suggestion of the assistant prosecutor, the judge inquired directly of Roseboro as to his change of mind. In response to a series of questions from the bench, Roseboro now denied that he had committed the acts. Reiterating that Roseboro might be guilty of perjury or obstructing justice, the judge detained Roseboro under $1,000 bail and directed the assistant prosecutor to move the charge of attempting to obstruct justice. Roseboro was thereupon confined in the county jail where he apparently remained through the trial.

During an interruption of the trial the court conducted an arraignment of Roseboro out of the presence of the jury but on the trial record. Roseboro, by assigned attorney Hansen, entered not guilty pleas on charges of making contrary statements under oath and of obstructing justice in the *Jamison* case, and the matter was set down for a preliminary hearing. Bail was continued at $1,000.

On two subsequent occasions during the trial defense counsel alluded to his intent to call Roseboro as a witness. The State took the position that if this were done it should be by *voir dire* because of the possibility that Roseboro might invoke the Fifth Amendment, citing *State v. Cullen*, 103 N. J. Super. 360 (App. Div. 1968) and *State v. Guido*, 40 N. J. 191 (1963). The defense raised no objection, and the trial judge on both occasions stressed that he would insist on Mr. Hansen being present to represent Roseboro since the latter had perjury and obstruction of justice charges pend-

ing and could "take the Fifth" also by reason of possible implication in the Nigro matter.

Roseboro was called as a witness for the defense to testify on *voir dire*, as previously arranged. After he was sworn but before any interrogation by the defense, the trial judge stated that he understood that the "defendant" (Roseboro) had been "advised of his constitutional rights respecting self-incrimination", but that the court would permit some questions from defense counsel,

in order that the Court may properly establish that the questions do come within the purview of the incriminating statements in order that he invoke or determine whether or not he can invoke his constitutional rights in this regard.

The judge permitted responses by Roseboro to questions concerning his age, residence, schooling, relationship to Jamison, and presence in the court house on February 14, 1972. However, he sustained attorney Hansen's objections on self-incrimination grounds to the question, "were you on this floor, that is the third floor, outside this courtroom. . . ." Thereafter, the judge sustained all of Hansen's objections to defense questions with the one exception of a question directed to Roseboro's understanding of the questions being asked of him. Among the questions excluded was one as to Roseboro's conversation with defense counsel and the assistant prosecutor on February 14 and another as to Roseboro's having testified on that day. At no time in this sequence did the witness personally make a claim of privilege.

The following then ensued:

Q (By Mr. G—[defense attorney]) Isn't it true, Mr. Roseboro, that when you spoke to Mr. Jamison out in the hallway you said to him, "I don't know why they won't let me tell the truth"?

MR. PALUMBO: Your Honor, I will object. First of all it's his witness and he's leading him.

THE COURT: I'm going to sustain the objection, Mr. G.—Let's move along. We've got a jury in the jury room and your questions are all in the same vein, objectionable for the reasons already stated.

Q (By Mr. G—) Mr. Roseboro, isn't it true that it was your knife and it was you that had that knife the night of September 5, 1971?

MR. HANSEN: Objection, your Honor, same grounds.

THE COURT: Mr. G—, please, you're experienced enough to know certainly that that would be incriminating and he's already exercised his constitutional rights in this regard. And you may be assured he will continue to do so, it well appears.

MR. G—: Well, Judge, I didn't hear this man exercise his constitutional rights. I have heard Mr. Hansen say what he advises him. I haven't heard this man say anything. As a matter of fact, his counsel has very effectively blocked him from testifying, doing a very good job of it, too. But I haven't heard this man say one word.

Now, what I'm trying to do, so that your Honor will understand, I'm trying to elicit some kind of response from this man that would indicate that he is exercising his rights.

THE COURT: You're not going to get it. If that's what you want, if you want to hear it, Mr. Hansen may whisper in his ear, [* * *], if that's what you want. I want to move this matter along. You want to hear the witness say, "I don't want to testify"?

MR. G—: Yes, sir.

THE COURT: All right. Whisper in his ear, Mr. Hansen.

THE WITNESS: I refuse to answer on the grounds that my answers may tend to incriminate me.

Thereafter, Hansen having stated that he would advise the witness not to answer any questions pertaining to the incident of September 5, 1971 or as to charges growing out of it, the defense counsel terminated the examination. The State then demanded a ruling that under the *Cullen* and *Guido* cases, cited above, the defense would be precluded from calling Roseboro in the presence of the jury. The court stated that Mr. G—had already indicated he had no objection to that. In fact, the defense attorney had not so expressly indicated, but he did not dispute the request of the State or the statement of the Court. Roseboro was not called, nor did the defense attempt to prove Roseboro's out-of-court admission that he, not defendant, stabbed Nigro or his in-court testimony to that effect during the pre-trial hearing on February 14.

█ Before discussing the handling by the trial court of the matter of Roseboro's testimony we advert to the contention of the State, agreed to by the Appellate Division, that the failure of the defense to call Roseboro as a witness before

the jury, or to offer the transcript of his confession in evidence as was clearly its right, as a declaration against penal interest, was deliberate trial tactics, precluding appeal on the point. The State argues that the defense kept Roseboro off the stand before the jury to prevent his being confronted with the sworn statement he had once given the police inculpating defendant. Our careful perusal of the entire trial record leads us to disagree with that appraisal of defense counsel's purposes and motives.

The defense had vigorously asserted its intention to call Roseboro as a witness on several occasions, beginning with the pretrial hearing on February 14, notwithstanding counsel knew the State possessed a sworn statement from Roseboro inculpating defendant which would undoubtedly be used by the State to attack his credibility should he testify either that he did the stabbing or that he had previously admitted doing so. The whole defense effort on the *voir dire* of Roseboro was an elaborate sham if there was no intent, if permitted by the court, thereafter to examine Roseboro before the jury. And we cannot believe the defense was wasting its time with such a sham. The trial court itself was satisfied of the sincerity of the defense in that regard. Prior to summations the court, on request of counsel, ruled that neither side would be permitted in summation to refer to the failure of the other to call Roseboro as a witness. It said:

\* \* \* It would be highly improper for counsel to say in their summations \* \* \* "Why wasn't Mr. Roseboro called as a witness". Because certainly Mr. G— wanted him as a witness and he wouldn't testify.

█ We need not here pursue the question whether the defense had a right to call Roseboro before the jury after what transpired on the *voir dire*.[1] It is plain to us that defense

[1] When the State calls as a witness an accomplice of the defendant or one known to have had some connection with the crime, knowing the witness will plead his privilege against self-incrimination,

counsel justifiably concluded that the court would not allow it, probably concurring with the court's view that *Cullen* and *Guido* dictated that course once the claim of privilege had been sustained, and may well have believed that the interests of his client might suffer if he forced the issue.

What does give us pause, however, in relation to the handling of the defense, is why counsel did not offer in evidence the transcript of Roseboro's testimony of February 14 exculpating defendant. This was clearly admissible as a declaration against Roseboro's penal interest. *Evidence Rule* 63(10). While this would not have had the dramatic force of an admission by Roseboro before the jury in person, it would at least have brought home to the jury the fact which the defense was obviously eager to establish — that Roseboro had once admitted, and before this very judge, that he, not defendant, had done the knifing.

On balance, and after consideration of the prejudicial effect of the intercession of the judge at the initial proffer of testimony by Roseboro, discussed hereinafter, we give the defendant the benefit of the doubt and assume his counsel failed to offer the transcript through inadvertence or neglect such as, in these peculiar circumstances, should not be held to bar defendant's right to relief.

The handling by the trial judge of the information that Roseboro wanted to testify for defendant and the manner of

---

it is ordinarily preferable first to examine the witness on *voir dire*, as otherwise the circumstances may lead the jury to draw unfavorable inferences against defendant. This is particularly so if after the witness's refusal to answer, the prosecutor asks questions as to prior statements by the witness reflecting on defendant. See *State v. Fournier*, 91 *N. J. Super.* 477, 480–481 (App. Div. 1966); *State v. Cullen, supra* (103 *N. J.* Super. at 364). In the court's discretion, the State may be precluded from calling such a witness before the jury if he declined to testify on *voir dire*.

However, no similar policy considerations would seem to apply in the reverse situation, where the defense desires to call a witness who is expected to decline to testify, asserting his privilege. However, we need not rule on the question definitively for present purposes. A proper ruling in any particular case will generally depend on the precise attendant circumstances.

conduct of the *voir dire* thereafter cannot be approved, granting the undeniable good faith of the judge and the skill and care he exercised in all other aspects of the trial. In *State v. Jennings,* 126 *N. J. Super.* 70 (App. Div. 1972), certif. den. 60 *N. J.* 512 (1972) (decided about the time the instant case was being tried but reported later), in which a similar effort by a trial judge to protect a defense witness against self-incrimination resulted in a reversal, the court stressed the fact "that the privilege against self-incrimination is personal to the individual claimant, and the election to invoke it must be exercised by the witness himself, on the stand and under oath, after hearing a question or questions addressed to him. It is not invocable by an attorney as his surrogate". 126 *N. J. Super.* at 75. And see *State v. Williams,* 59 *N. J.* 493, 502 (1971) ; *In re Boiardo,* 34 *N. J.* 599, 604 (1961) ; *State v. Fary,* 19 *N. J.* 431, 435 (1955) ; *State v. Mohr,* 99 *N. J. L.* 124, 129–130 (E. & A. 1923). It was further stated in *Jennings* that the principal reason why a claim of the privilege is closely circumscribed is "that it is at war with the great objective of the trial — the ascertainment of the truth as to the issues contested" (126 *N. J. Super.* at 75).

In its relative subordination to the principle of encouraging the fullest trial exploration of the facts, the privilege against self-incrimination takes its place alongside other evidential privileges known to the law. Thus, writing for the Court in *In re Richardson,* 31 *N. J.* 391, 396–397 (1960), Justice Jacobs noted, in reference to the attorney-client privilege :

Since the privilege results in the exclusion of evidence it runs counter to the widely held view "that the fullest disclosure of the facts will best lead to the truth and ultimately to the triumph of justice". See *In re Selser,* 15 *N. J.* 393, 405 (1954). The policy supporting full disclosure necessarily competes with the policy supporting the privilege and courts are frequently required to balance them ; in the process they properly point out that *since the policy of full disclosure is the more fundamental one* the privilege is not to be viewed as absolute and is "to be strictly limited to the purposes for which it exists." See *In re Selser, supra,* 15 *N. J.* at *page* 405 ; 8 *Wigmore, supra,* § 2291, *p.* 557. (Emphasis added.)

Note also the comment of the Chief Justice in *State v. DeCola,* 33 *N. J.* 335, 345 (1960), where, in discussing waiver of the privilege against self-incrimination, he said:

Moreover at a trial concerning others, the need for justice to the litigants understandably tends to loom above the seemingly more remote value, the privilege of the witness; * * *.
See also *State v. Briley*, 53 *N. J.* 498, 505-506 (1969)'.

The conversion forthwith by the trial judge of the coming forward of Roseboro as a prospective witness in the case into the equivalent of a preliminary arraignment of Roseboro as a defendant offering to plead guilty on a yet non-existent charge of atrocious assault and battery, and assigning counsel to him in that connection, was both premature and ill-advised in these special circumstances. So was the hastening, after Roseboro's retraction on advice of counsel, to direct the bringing of a charge of obstruction of justice against the witness and his arrest and jailing on that charge. These steps were taken in the context of an incipient criminal trial wherein the first concern of the court should have been the free flow of evidence for the enlightenment of the jury in that trial.[2] In these circumstances the wise judicial course would have been, and ordinarily will be, to leave the matter of suspicion of criminality attendant upon the actions of the prospective witness to the prosecutor, for such attention at the conclusion of the case as he might deem warranted.

If the pretrial interlude had not occurred and the defense attorney had simply called Roseboro for the defense pursuant to its notice to the State that he would be a witness,

---

[2]We are of course not prejudging the truthfulness of either of Roseboro's versions as to what happened on the day of the assault and assume the trial court was not either, as clearly it should not have. But the principle of full disclosure is not weakened by the obvious consideration that witnesses will lie as well as tell the truth. The assumption is that, in the long run, given all available information, the fact finder will generally arrive at the truth.

Roseboro would presumably have testified to the same effect as he did at the pretrial session, exculpating defendant but undoubtedly facing confrontation with his contrary original statement to the police. The jury would thus have had all the available evidence before it for resolution of its credibility.

Any notion that it was appropriate at the pretrial phase of the case to assign counsel to Roseboro in order to advise him of his privilege against self-incrimination is mistaken. True, there is authority that it is within the discretion of a judge to advise a witness as to his privilege where the witness is being brought into court involuntarily, as under subpoena. See *State v. Fary,* 19 *N. J.* 431, 436 (1955), mentioning the discretionary right of a judge to warn a witness of the privilege "when * * * justice requires it", in the context of a discussion of the need for warnings to a witness subpoenaed before a grand jury; and *State v. Williams,* 59 *N. J.* 493, 503 (1971) (also dealing with a witness called before the grand jury). But in the instant situation, when the witness was voluntarily coming forward to testify, when he had been thoroughly cautioned as to his peril and his rights, including his right to counsel, by the defense attorney, the assistant prosecutor and the trial judge himself, and he still persisted in wanting to testify that he, not defendant, had stabbed Nigro, there was a mistaken exercise of discretion by the judge in assigning to him a lawyer he did not want or request, before permitting him to testify at the trial. As indicated above, there should have been weighed in the balance the more immediate interests of the defendant on trial and those of the general public to the fullest disclosure of the relevant evidence before the trial jury before any solicitude for protection of the volunteering witness.

The Fifth Amendment is to the effect that "no person * * * shall be *compelled* * * * to be a witness against himself". (Emphasis added.) Although our state rule does not

use language of compulsion[3] that element is recognized as cardinal to application of the rule. "Protection is given a *witness* to achieve the basic policy against compulsory self-condemnation". *State v. DeCola, supra* (33 *N. J.,* at 341) (emphasis in the original). At the pre-trial session Roseboro was not, in the remotest sense, being *compelled* to testify. Quite to the contrary.

A confession by another is of such probative importance in a criminal trial that its exclusion, or the unreasonable impairment of an attack on its repudiation, although sanctioned by local evidence rules, has been held a denial of the defendant's due-process right to a fair trial. *Chambers v. Mississippi,* 410 *U. S.* 284, 93 S. Ct. 1038, 35 *L. Ed.* 2d 297 (1973). We are of the firm opinion that the diversion by this aspect of the proceedings below of the prospective testimony in the defendant's favor, taken together with the other matters mentioned elsewhere herein, visited such harm upon the defendant's case as warrants reversal.

What occurred at the *voir dire* of Roseboro was largely anti-climactic after the turn-around of the witness at the pretrial session. But we are compelled to notice the failure of adherence by the court at the *voir dire* to the established principles summarized in *State v. Jennings, supra,* concerning the procedure for assertion of the privilege against self-incrimination by a witness. Allowing the attorney for the witness to make objections to questions rather than requiring the witness himself to claim the privilege and to justify it under oath was incorrect. *State v. Jennings, supra* (126 *N. J. Super.* at 77) ; *In re Boiardo, supra* (34 *N. J.* at 604). The treatment by the court of the defense insistence that the witness rather than the attorney claim the privilege, as in effect a technicality, was consequently unwarranted. Moreover, one can never tell when a witness may decide to answer

---

[3] *Evidence Rule* 25 (*N. J. S. A.* 2A:84A–19) : "Subject to Rule 37 [waiver] every natural person has a right to refuse to disclose in an action * * * any matter that will incriminate him * * *."

questions, even one who has indicated a contrary intent to his counsel or the court, and the court should always keep the door open for a decision by the witness to testify rather than discourage it.

In passing, it should be noted that the sustaining of the privilege in respect of potential conflict of new testimony by the witness with the prior statement under oath, and the consequent possibility of self-incrimination in relation to false swearing or perjury, was erroneous. Under *State v. DeCola, supra,* the witness should have been required to testify, being protected as a matter of law against the use of such testimony in any later prosecution for false swearing or perjury (33 *N. J.,* at 351–352). See also *State v. Jennings, supra* (126 *N. J. Super.* at 78).

Whether there was a cognizable fear of self-incrimination on the pending obstruction of justice charge is more debatable, and we offer no present opinion on that subject, absent argument thereon. The court might, however, have well rejected any claim based on commission of the substantive offense as the most recent position of the witness, as stated at the pretrial hearing, was that he was innocent of the stabbing. If such rejection by the court were unexpectedly followed by testimony by the witness inculpating himself he would automatically have been protected against its subsequent use against him, having made his claim of privilege. *State v. DeCola, supra* (33 *N. J.* at 352–353) and authorities there cited.

The foregoing observations underscore the high necessity of having had the witness himself claim and explain the claim of privilege, under oath, so that the judge could properly and impartially discharge his independent obligation of determining whether the claim had merit. *In re Boiardo, supra* (34 *N. J.* at 604).

We turn to defendant's contention that the offense of assault with an offensive instrument merged with that of atrocious assault and battery and that therefore there should have been no conviction or sentence as to the former. We note

that no claim to this effect was made at trial. However, since the question will undoubtedly arise at the retrial, we express our view that the contention, although belated, has merit.

In *State v. Hill*, 44 *N. J. Super.* 110, 112 (App. Div. 1957) Judge (later Justice) Francis correctly stated the rule of merger as follows:

The test to be applied in deciding the issue of merger is whether a particular act involved in a single transaction is a distinct criminal affair or an integral part of the principal offense charged. A prosecution for any part of a single crime bars any additional prosecution or sentence for the whole crime or any other constituent element of the whole crime. *State v. Labato*, 7 *N. J.* 137, 145, 146, 150 (1951) ; *State v. Mowser*, 92 *N. J. L.* 474, 483 (*E. & A.* 1919) ; *State v. Cooper*, 13 *N. J. L.* 361, 375 (*Sup. Ct.* 1833) ; 15 *Am. Jur., Criminal Law*, § 386, *p.* 388 (1938).

The evidence here, considered most favorably for the State's position, indicates that the attack upon the victim was basically a single transaction, and the menacing of the victim with the knife an "integral part of the principal offense" — *i. e.*, the atrocious assault and battery constituted by the wounding of the victim with the knife. The offense of assault with the knife therefore merged with the offense of atrocious assault and battery, and the only proper sentence was on the latter count.

In view of the foregoing conclusions we need not deal with the argument that the sentence was excessive to the point of requiring appellate modification.

For the reasons aforestated the judgment is reversed and the cause is remanded for a new trial.

SULLIVAN, J. (concurring). I agree that it was fundamental error requiring a new trial not to have had the jury made aware that Roseboro, who was one of the four persons involved in the September 5, 1971 incident, had at one time stated under oath that he and not defendant had actually stabbed Nigro. However, I cannot subscribe to the criticism of the trial judge's handling of the Roseboro situation when

it was presented to him during the early stages of defendant's trial. The majority opinion describes it as the trial judge being informed "that Roseboro wanted to testify for defendant." It was much more than that.

As I read the transcript, when defendant's counsel and the assistant prosecutor sought a conference with the trial judge they must have had in mind the possible dismissal of the atrocious assault and battery charge against defendant. Defendant's counsel informed the court that Roseboro had told him and the assistant prosecutor that "I don't want to see someone blamed for something I did." Defense counsel then suggested "* * * in the interest of justice * * * your Honor ought to hear from this individual." The trial judge said he had discussed the matter in chambers with counsel and understood that Roseboro desired "to enter a plea of guilty yourself." He thereupon questioned Roseboro who stated that he, not defendant, was the one who actually had stabbed Nigro and indicated that he would plead guilty to such a charge. It was at that point that the trial judge insisted that Roseboro have counsel, adding "and after you speak with counsel, if that's your desire to plead guilty to an accusation, we'll proceed in that way."

While nothing was said directly about dropping the charge against defendant, I think it is implicit in the overall picture. There was no purpose in defense counsel and the prosecutor taking up with the court the matter of Roseboro's "desire" to plead guilty to the stabbing, unless it included consideration of the dismissal of the atrocious assault and battery charge against defendant. Certainly, if the State had filed an accusation against Roseboro, as the trial judge indicated would be done, and Roseboro pleaded guilty, it would have been incongruous for the State to thereafter contend that it was really defendant, and not Roseboro, who stabbed Nigro. (No theory of aiding and abetting is involved.)

In the circumstances, I think the trial judge acted quite properly.

SULLIVAN, J., concurs in result.

382

*For reversal and remandment* — Acting Chief Justice JACOBS, Justices HALL, SULLIVAN, PASHMAN and CLIFFORD and Judges CONFORD and COLLESTER—7.

*For affirmance*—None.