STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
ANDREW HENRY LYLE, DEFENDANT-APPELLANT.

Argued May 28, 1975—Reargued September 23, 1975—
Decided June 10, 1977.

*Mr. Richard J. Plaza,* Designated Counsel, argued the cause for appellant (*Mr. Stanley C. Van Ness,* Public Defender, attorney; *Mr. Plaza,* of counsel and on the brief).

*Ms. Sara A. Friedman,* Assistant Prosecutor, argued the cause for respondent (*Mr. Joseph P. Lordi,* Essex County Prosecutor, attorney; *Ms. Friedman,* of counsel and on the brief).

PER CURIAM. Two months after this Court decided *State v. Deatore,* 70 *N. J.* 100 (1976), the United States Supreme Court handed down its decision in *Doyle v. Ohio,* 426 *U. S.* 610, 96 *S. Ct.* 2240, 49 *L. Ed.* 2d 91 (1976), which was pending when *Deatore* was argued. See *State v. Deatore supra,* 70 *N. J.* at 109, n. 5. Those decisions so control the instant case as to compel us to reverse the judgment of the Appellate Division which, in an unpublished opinion, upheld defendant's first degree murder conviction. A dissent in the court below brings the cause here as a matter of right. *R.* 2:2–1.(a)(2).

I

Defendant, Andrew Henry Lyle, known as "Henry," admits the killing of one Egbert Francis but interposes the defense of self-defense. The weapon was a handgun, said to have been routinely kept in a desk drawer at defendant's variety store, the "House of Shango," on Bergen Street, Newark. The evidence tended to show that the tragic events of December 10, 1971 were the culmination of a long-standing feud, smoldering because of the victim's dalliance with defendant's wife and sparked by an altercation which originated when vehicles were being parked adjacent to the store premises (Francis, with the aid of others, was moving lumber and other materials into a store next to defendant's on the day in question). This altercation escalated from an exchange of vulgarisms on the sidewalk to the point where Francis and defendant ended up in defendant's store. Lyle's position is that Francis lunged at him with a screwdriver, that he avoided this attack and ran to the desk, grabbed a gun from one of the drawers, and fired. Francis made his way out of the store and collapsed in the entrance of the adjoining premises.

The Appellate Division perceived the critical nature of the factual issue thus presented, pointing out that

* * * whether or not Francis attacked defendant with a screwdriver was the essence of the defense, either for acquittal by reason

of self-defense or for a verdict less than first-degree murder. Only two persons know whether in fact the screw-driver incident took place in the House of Shango at the time of the homicide — decedent and defendant. The basic question then was the credibility of defendant's version of what had occurred in that respect in the light of all the evidence in the case, including that of his witnesses.

Because of the significance of the manner in which the precise issue before us arises, it is necessary to relate the factual context in some further detail.

Before dying the victim was able to gasp the name "Henry" to his brother, who asked what had happened. When the police arrived at the scene, they spoke to Francis's brother, immediately after which they proceeded to defendant's store where the shooting had occurred. When admitted to the premises the police asked if "Henry" was there. Detective Herbert Friday testified at trial that in response to this question defendant replied, "Yes, I'm Henry. I shot him."

Thereupon, according to the detective, he gave the defendant the *Miranda* warnings (*Miranda v. Arizona,* 384 *U. S.* 436, 86 *S. Ct.* 1602, 16 *L. Ed.* 2d 694 (1966)), to which defendant made no response nor did he say anything else while Detective Friday was still inside the store.[1] A search of the premises revealed only the "contents" of the

---

[1] Detective Friday's direct examination included the following:

Q. What did you do next, Detective [immediately after defendant identified himself and admitted the killing]?

A. I then advised the person named Henry that he was under arrest for the shooting of the person next door, Francis, Egbert, and I advised him that he had the right not to say anything and if he did it could be used against him. Also advised him he had a right to have a lawyer before he did say anything.

Q. Did he make any response to this, Detective?

A. No.

    *        *        *        *        *        *        *        *

Q. Detective, other than the statement that you indicated Henry Lyle made to you outside of the — at the door of the House of Shango, did he say anything else to you while you were inside the House of Shango?

A. No.

building. There was no sign of any struggle.[2] The officers did not find any screwdriver, were not looking specifically for one,[3] and defendant never mentioned such an instrument.[4]

---

[2]Detective Friday's testimony as to the search was as follows:
Q. Now, detective, in the House of Shango, did you make any search?
A. Just a visual search of the interior.
Q. And could you tell us, please, what this visual search revealed, if anything?
A. Just revealed inside — the contents, that there was no disturbance. There didn't appear to have been any disturbance in the store.
Q. When you say "disturbance," what do you mean by that term?
A. It appeared that there was nothing overturned or knocked down or out of place to show signs of any type of struggle.

[3]On cross-examination defense counsel questioned Friday about a visual survey of the premises:
Q. Then after you handed the gun over, what else did you do in the store there.
A. I didn't do anything else in the store other than just look around the store.
Q. You looked around?
A. Visually.
Q. What were you looking for?
A. Just glanced around.
Q. What were you looking for?
A. Just the general condition of the store.
Q. Anything else?
A. No.
Q. Were you looking for any screwdrivers?
A. No.

[4]On re-direct examination of Detective Friday the prosecutor pursued the issue of a search for a screwdriver:
Q. Now, Mr. Melnikoff asked you a question about whether you were looking for a screwdriver. Do you recall that?
A. Yes.
Q. Did the defendant, Henry Lyle, say anything to you about a screwdriver?
A. No.
Q. In your visual search of the store, did you, in fact, see any screwdriver at the store?
A. No, I don't remember seeing any screwdriver.

Defendant testified on his own behalf in accordance with his version of the events as set forth at the beginning of this opinion. On cross-examination he affirmed that he had not said "anything else" to the detective at the scene. The prosecutor then undertook to direct the testimony towards when it was, for the first time, that Lyle had mentioned to the police the episode with the screwdriver. The initial question suggested that it was only after defendant had arrived at police headquarters and was being interrogated by Detective Wehrle that the self-defense theory emerged, a suggestion which defendant rejected, insisting that he told a detective of the victim's attack while in the car on the way down to headquarters.[5]

---

[5] Q. Now, this was the first time that you mentioned to any police officers, when you mentioned to Wehrle, that Eggie had come at you with a screwdriver, isn't that right?
A. No, it's not right.
Q. You told somebody else?
A. Yes, I did.
Q. Who did you tell?
A. Two police officers that brought me down in the car to the Headquarters.
Q. You told them that?
A. Yes.
Q. You told [Detective] Lebo that?
A. I think that's his name.
Q. You made no mention of it to Detective Friday, did you?
A. No.
Q. And you didn't make any mention of it to Bobby [defendant's brother], did you?
A. No.
Q. At this point, you didn't know — when Detective Friday was at your store, you didn't know where the screwdriver had gone to that Eggie used, had you?
A. No.
Q. You weren't sure at that point whether Eggie dropped it in the store, were you?
A. No.
Q. You weren't sure if Eggie had carried it out with him after he had been shot, were you?
A. No.

Finally, in his summation the prosecutor resorted to the cited testimony *in extenso*:

The next person who testified for the State was Detective Friday, and I think Detective Friday's testimony is most significant when he got to the scene after talking and questioning around among spectators, and there was quite a crowd. In fact, the crowd started to gather within moments of the shooting, he goes to the House of Shango and the defendant says, "My name is Henry. I shot him," and then he shows him the gun. He at no time tells Detective Friday about the screwdriver.

Now here is a man who has told you that he killed in self defense, that Egbert Francis came at him with a screwdriver, and yet the policeman who was there within moments, fifteen minutes at the most, of the killing, when the leads or clues would be hot, he doesn't mention anything at all about the screwdriver to him. Nobody else sees a screwdriver except for Henry Lyle. * * * [Nobody] had any idea that the defendant would claim later that he was defending himself from an attack by a screwdriver, but he doesn't mention it to Friday at all.

✻        ✻        ✻        ✻        ✻        ✻        ✻        ✻

And I submit he doesn't mention it until he had time to think and to realize that he was in a pretty big pickle, in that he had the upper hand in the sense that the other witnesses could not speak.

## II

On this appeal defendant makes the argument, *inter alia,* that the State's broadside attack on his self-defense theory, on the basis of his silence, amounted to prejudicial error requiring reversal. No objection having been made, either to any of the lines of inquiry adverted to or to the prosecutor's summation, the question comes up as one of plain error.

In *Doyle v. Ohio, supra,* the Supreme Court resolved an issue left open in *United States v. Hale,* 422 *U. S.* 171, 95 *S. Ct.* 2133, 45 *L. Ed.* 2d 99 (1975), that is, whether the State's use of a defendant's post-arrest silence for purposes of impeaching his exculpatory defense violates due process.

Q. And, yet, you made no mention to Detective Friday that Eggie had come at you with a screwdriver, did you?
A. No.

The *Doyle* Court answered in the affirmative, thus barring the prosecutor, on constitutional grounds, from arguing that such silence is indicative of guilt. *Doyle v. Ohio, supra,* 426 *U. S.* at 618, 96 *S. Ct.* at 2245, 49 *L. Ed.* 2d at 98.[6] The holding was limited to those situations in which the defendant's silence (in the form of failure to utter an exculpatory statement in circumstances where, the prosecution would argue, such explanation might reasonably be expected) occurs following receipt of the warnings required by *Miranda v. Arizona, supra.* The Court's reasoning on this point is relevant to the fact situation before us:

Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these Miranda rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested.
[426 *U. S.* at 617, 96 *S. Ct.* at 2244, 49 *L. Ed.* 2d at 97.]

There is some conflict in the voluminous record before us as to whether, at the time of his arrest, Lyle knew or understood these *Miranda* rights. However, as was pointed out in *State v. Deatore, supra,* as a matter of State law the use of a defendant's silence is improper irrespective of whether such warnings are given. 70 *N. J.* at 117, n. 10. Hence, in the case before us it was manifestly improper to use defendant's silence to attack his self-defense theory as a fabrication. Because this defense was at the very heart of the case, the prosecutor's action was "of such a nature as to have been clearly capable of producing an unjust result * * *" and hence in the magnitude of plain error. *R.* 2:10–2; see *State v. Macon,* 57 *N. J.* 325, 335–36 (1971); *State v. Melvin,* 65 *N. J.* 1, 18–19 (1974).

---

[6]The Supreme Court's earlier holding in *U. S. v. Hale,* 422 *U. S.* 171, 95 *S. Ct.* 2133, 45 *L. Ed.* 2d 99 (1975), avoided the constitutional ground of decision, resting the holding on the court's supervisory power over lower federal courts on evidential issues. 422 *U. S.* at 181, 95 *S. Ct.* at 2139, 45 *L. Ed.* 2d at 107.

## III

■ One further facet of this issue is deserving of comment. The State argues that the prosecutor's remarks in summation were permissible because of the defense assertion that the reason no screwdriver was found was that the police were derelict in investigating the incident after learning of Lyle's self-defense claim. The contention is that the prosecutor's statements were simply in the nature of rebuttal to defendant's position.

But the prosecutor's summation went well beyond this. While it may have been permissible for the State to argue that the police never found the screwdriver because no one suggested they should search for it, the comments in question constituted an attack on defendant's version of the events by the impermissible use of his silence.

## IV

In view of the fact that the case is being remanded for retrial, we address an issue which very likely will arise again, dealing with the admissibility of a hearsay statement of the victim. As we have indicated, for the State it was advanced in evidence, as relevant to motive and the state of mind of defendant, that he and his wife Henrietta Lyle were separated on the date of the killing; that some six months previous thereto, on July 3, 1971, Mrs. Lyle was living at the home of defendant's parents on Lehigh Avenue in Newark, where the couple had lived together briefly during a reunion after a previous separation; that on that day there was a physical altercation between them of sufficient violence that facial bruises on the wife were observed; that police were called and arrested defendant; that the wife later declined to sign a complaint and the charge was therefore dismissed. It was further asserted in testimony by the victim's sister, Iola Francis, that she knew defendant and his wife, knew that they were separated, and that her brother, the decedent, had been seeing Mrs. Lyle;

that on a morning in July 1971 at about 5:30 o'clock she had left her home to go to her mother's house and passed by Henrietta Lyle's place of residence on Lehigh Avenue en route; that upon seeing her brother's car parked there she parked her own vehicle and awaited developments, being concerned for her brother's well-being. She testified that after attracting her brother's attention and leaving the scene and going to his shop nearby (a trip described as lasting no more than two minutes), he discussed what he had been doing. She quoted decedent as having said, "Henry came running up the stairs, screaming 'I know you're there Egbert — you better get out of my house,'" and that defendant tried to break the door down. This conversation occurred shortly after the event described by Iola Francis and was admitted by the court under the rule, *Evid. R.* 63(4)(b), as an "excited utterance."[7]

■ Defendant strenuously contends that this statement was not only irrelevant and remote but also that it was something other than an "excited utterance" and thus was inadmissible hearsay. In light of all the proofs before the Court, we find it was properly admissible in both regards. As we have said, the probative value of the recounted incident in tending to establish motive and state of mind is clear. Its remoteness in time from the fatal occurrence had to do with its weight rather than its admissibility. *See State v. Myers,* 7 N. J. 465, 484–85 (1951); *State v. Donohue,* 2 N. J. 381, 388 (1949); *State v. Schuyler,* 75 N. J. L. 487, 488 (E. & A. 1907); *State v. Slocum,* 130 N. J. Super. 358, 363–64 (App. Div. 1974). *See generally* 2 *Wigmore, Evidence* § 397 (3d ed. 1940).

---

[7] *Evid. R.* 63(4)(b) provides:

A statement is admissible if it was made * * * (b) while the declarant was under the stress of a nervous excitement caused by such perception in reasonable proximity to the event, and without opportunity to deliberate or fabricate.

■ ■ As to the hearsay issue, we find the elements of admissibility described in *Evid. R.* 63(4)(b) to have been satisfied: "nervous excitement" was generated by the victim's involvement in the event perceived, after which he fled half clothed to escape defendant, there was reasonable proximity in time (two minutes) between it and his description of it to his sister, as well as lack of opportunity to deliberate or fabricate the circumstances of his flight from the illicit rendezvous. *Compare State v. Williams,* 106 *N. J. Super.* 170, 172 (App. Div.), certif. den. 55 *N. J.* 78 (1969), *cert.* den., 397 *U. S.* 1057, 90 *S. Ct.* 1405, 25 *L. Ed.* 2d 675 (1970) *with Lieberman v. Saley,* 94 *N. J. Super.* 156, 161 (App. Div. 1967). *See also Cestero v. Ferrara,* 57 *N. J.* 497, 503–04 (1971); *State v. Simmons,* 52 *N. J.* 538, 541–42 (1968), *cert.* den., 395 *U. S.* 924, 89 *S. Ct.* 1779, 23 *L. Ed.* 2d 241 (1969); *Sas v. Strelecki,* 110 *N. J. Super.* 14, 18 (App. Div. 1970); *Rogalsky v. Plymouth Homes, Inc.,* 100 *N. J. Super.* 501, 504 (App. Div.), certif. den., 52 *N. J.* 167 (1968). See generally 6 *Wigmore, supra,* § 1750. An excited utterance need not be contemporaneous with the exciting event. The crucial element is the presence of a continuing state of excitement that contraindicates fabrication and provides trustworthiness. The trial judge necessarily has discretion in making this threshold finding. *See State v. Williams, supra,* 106 *N. J. Super.* at 173. On the record before us, we cannot say that that discretion was abused.

## V

The judgment of the Appellate Division sustaining defendant's conviction is reversed and the cause remanded for a new trial. In the event of a conviction on retrial, the time already served and work time and good conduct time earned under the statute (*N. J. S. A.* 30:4–92; 30:4–140) should be credited against any sentence to be imposed by the trial court. See *R.* 3:21–8; *N. J. S. A.* 2A:164–26;

*North Carolina v. Pearce,* 395 *U. S.* 711, 89 *S. Ct.* 2072, 23 *L. Ed.* 2d 656 (1969).[8]

CONFORD, P. J. A. D., Temporarily Assigned, dissenting. The Court here reverses a conviction for murder on the premise that the prosecutor improperly made use at the trial of defendant's "silence" at the time of his arrest by cross-examination and adverse comment on summation. In fact, however, the defendant was not silent at that time but made a voluntary incriminatory statement to the police inferentially inconsistent with his exculpatory story as a witness at the trial. This fact completely distinguishes *Doyle v. Ohio,* 426 *U. S.* 610, 96 *S. Ct.* 2240, 49 *L. Ed.* 2d 91 (1976), and *State v. Deatore,* 70 *N. J.* 100 (1976), upon which the Court relies in holding that defendant was denied due process and suffered a violation of his privilege against self-incrimination.

Moreover, the defendant at no time during trial made any objection whatever to the prosecutor's actions now complained of on appeal; and this notwithstanding he was represented by two experienced trial counsel. The Court inexplicably finds "plain error" in the prosecutor's conduct when in fact all he was doing was attacking the defense of self-defense in an entirely legitimate fashion and notwithstanding the jury were amply justified on the proofs in concluding that the defense of self-defense was fabricated by the defendant and that he was guilty of a premeditated,

---

[8]On this point, the Supreme Court has ruled:

We hold that the constitutional guarantee against multiple punishments for the same offense absolutely requires that punishment already exacted must be fully "credited" [such credit must, of course, include the time credited during service of the first prison sentence for good behavior, etc.] in imposing sentence upon a new conviction for the same offense. If, upon a new trial, the defendant is acquitted, there is no way the years he spent in prison can be returned to him. But if he is reconvicted, those years can and must be returned — by subtracting them from whatever new sentence is imposed. [395 *U. S.* at 718–19 & n. 13, 89 *S. Ct.* at 2077, 23 *L. Ed.* 2d at 665–666].

inexcusable murder. The Court undertakes no demonstration of how the alleged errors here "possessed a clear capacity to bring about an unjust result", *State v. Hock,* 54 *N. J.* 526, 538 (1969); *R.* 2:10–2, as required for reversal in a plain error context.

I

Defendant on December 10, 1971 was a storekeeper on Bergen Street in Newark. The victim, Francis, was refurbishing a next-door store preparatory to starting a business there. Francis sought the temporary use of defendant's driveway, and the latter refused. The proofs justify an inference that this incident bred some animosity and insults between the men. There was also evidence that, to defendant's knowledge, Francis had had an affair with defendant's estranged wife. Francis entered defendant's store about 45 minutes after the driveway incident, the proofs conflicting as to whether defendant invited him to do so. A few seconds later shots rang out and Francis emerged from the store and collapsed outside with two bullet holes in his back. He expired shortly thereafter.

Defendant admits the shooting. His defense at trial was that Francis entered his store and asked him to step outside and that when he refused Francis lunged at him two or three times with a screwdriver whereupon he ran to a desk in the rear of the store, took out a revolver and shot Francis in self-defense. The essential controversy at the trial was whether the screwdriver story was true. No screwdriver was ever found at the scene (which was promptly and thoroughly photographed by the police) nor was Francis observed by anyone (except as alleged by defendant) holding a screwdriver before or after he was in defendant's store.

Police arrived within minutes of the shooting. They went to defendant's store and he let them in. At Detective Friday's inquiry for "Henry" (defendant's name) he responded "Yes, I'm Henry. I shot him." Thereupon Friday placed him

under arrest and, according to Friday, advised him as to his *Miranda* rights. However defendant testified that several of the police were talking at once and he heard no recital of his rights.[1] At the request of the police he showed them where he had placed the gun. He was then transported to police headquarters. He told the accompanying officers, according to his testimony, that Francis had come at him with a screwdriver. At headquarters, after being given *Miranda* warnings, he repeated the version of the screwdriver attack to the investigating detective.

Appraisal of the legal issues projected by the defendant upon which the Court bases its reversal of the conviction requires close attention to the trial tactics and actions of defense counsel as well as the conduct of the prosecutor impugned by the Court.

The opening by the State to the jury contained no allusion to defendant's so-called silence. In opening for the defense, counsel stated that immediately on the arrival of the police defendant told them "exactly what happened." He outlined the self-defense hypothesis mentioned above and then he asserted that when the police arrived defendant admitted he had "probably just shot a man" and that he "told the police that the man had attacked him". Thus, from the opening of the defense, the State had cause to believe the defendant was going to testify to a full disclosure to the police on initial confrontation concerning the nature of his justification for the shooting.

Apparently the first action of the prosecutor which the Court finds exceptionable is his asking Detective Friday on direct examination whether defendant said anything in response to being given the *Miranda* warnings or otherwise after his initial statement, and eliciting a negative answer. However, this could be regarded as responsive to defendant's opening statement that defendant had told the police

---

[1] Defendant claims no violation of the *Miranda* rule, *Miranda v. Arizona*, 384 *U. S.* 436, 86 *S. Ct.* 1602, 16 *L. Ed.* 2d 694 (1966).

he had been attacked. Second, it was proper narrative to show all the circumstances surrounding defendant's inculpatory initial statement "I shot him". Finally, not only did defendant's two trial counsel see nothing harmful in the interrogation at the time, but, on cross-examination, they had Friday repeat that defendant said nothing after being given the *Miranda* warnings.

Thereafter, on further cross-examination of Detective Friday, defense counsel launched the first of several aspersions on the police during the trial for not having searched at the scene for the alleged screwdriver. (See p. 407.) Completely justifiable, therefore, was the State's redirect examination of Friday to develop that defendant had never mentioned a screwdriver to him. *Id.* at 407.

The Court's opinion then focuses on the State's cross-examination of defendant, emphasizing questions as to when the defendant first told the police about the screwdriver. (PP. 407–408). However, except for one matter to be mentioned, this cross-examination simply went over the ground of defendant's direct examination from which it had already appeared that defendant had said nothing about the attack upon him until he voluntarily related it to Detective Wehrle on the evening of the killing at police headquarters. The cross-examination was actually helpful to the defense as it permitted defendant to make the self-serving point that he had told the police about Francis' alleged attack on him on the way from the store to the police station — a detail he had omitted on direct examination. Further, all of this examination was relevant to the previous implied criticism of the police by the defense for not having looked for the screwdriver.

Finally, the Court alludes to the prosecutor's comments in summation concerning defendant's not having mentioned the screwdriver incident to Detective Friday. (P. 408). Apart from the ample legal justifications for such comments from either a due process or a self-incrimination standpoint, to be discussed in II and III hereinafter, attention must be di-

rected to the relevant portions of the defense summation. Each of the two defense counsel was permitted to make a summation, and *each* launched an attack on the credibility of the State's case by reason of the failure of the police to search for the critical screwdriver — the first counsel making one such allusion and the second one, two. In my judgment, this persistent theme of the defense, during both trial and summation, would alone have justified the prosecutor's comments concerning defendant's silence about the screwdriver when confronted by Detective Friday. Indeed, the defense expected it. They asserted in summation:

> But the State didn't put on one witness to say they even looked for the screwdriver. I can't understand it. I am sure Mr. Bolan [prosecutor] is going to suggest to you that Mr. Lyle made this whole thing up as he sat in the police station.

And when Mr. Bolan did make substantially that contention in summation the defense offered not a word of objection. They obviously realized the subject was one of fair comment on the issue of defendant's credibility developed during the trial and properly for the resolution of the jury by its verdict.

## II

The major flaw in the Court's opinion is the failure to appreciate that the basic target of the prosecutor's cross-examination and summation was the defendant's affirmative statement to the police, volunteered before any *Miranda* warnings were given (if in fact given): "I'm Henry. I shot him." This was not silence; it was a statement. The privilege of self-incrimination is one to remain totally silent. It does not encompass a right to speak to the event *in part,* and *then* to remain silent, with immunity from adverse use by the State of the probative vulnerability of the partial statement or of the inconsistencies between such statement and a later varying statement or position by defendant. *Agnellino v. State of New Jersey,* 493 *F.* 2d 714, 728, 729 (3d Cir. 1974) (con-

curring opinions of Seitz, C. J. and Weis, J.); *People v. Allen,* 37 *Ill. App.* 3d 619, 346 *N. E.* 2d 486 (App. Ct. 1976); *People v. Gant,* 55 *Mich. App.* 510, 222 *N. W.* 2d 784 (Ct. App. 1974).

From the fact that defendant said "I shot him", and ended his communication to the police at that point without offering the self-defense explanation at the same time, a reasonable fact-finder could conclude that the later story given to the police and at the trial by defendant was lacking in credibility since a man who had been driven to fire upon another to ward off an attack with a deadly screwdriver would in all probability, if he spoke at all, have given that explanation to the police — not just stated, guiltily, "I shot him". See the concurring opinion of Justices Sullivan and Schreiber in *State v. Deatore, supra,* 70 *N. J.* at 119, and that of Justice Clifford and the writer in the same case, 70 *N. J.* at 127. Note also Justice Frankfurter's oft cited *dictum* in a similar context in *Adamson v. California,* 332 *U. S.* 46, 60, 67 *S. Ct.* 1672, 1680, 91 *L. Ed.* 1903 (1947): "The notion that to allow jurors to do that which sensible and right-minded men do every day violates the 'immutable principles of justice' as conceived by a civilized society is to trivialize the importance of 'due process'".

The rational adverse inference as to defendant's credibility is here much stronger than in the case of total silence and at the same time escapes the legal prohibition against the drawing of such inferences in the case of mere silence spelled out by the recent decisions in *United States v. Hale,* 422 *U. S.* 171, 95 *S. Ct.* 2133, 45 *L. Ed.* 2d 99 (1975), *Doyle v. Ohio* and *State v. Deatore,* both *supra.*

Once the defendant made and completed his inculpatory statement the State had a vested right to comment on the absence therefrom of the exculpatory addition thereto later appended by defendant. Not to permit the State to do so unwarrantably impinges on the State's right to mobilize its whole legitimate armament against the defendant's credibility in the service of the judicial mission to elicit the truth. The

defendant's self-incrimination rights are not involved since his voluntary statement to the police may be considered a waiver of his privilege. As was stated by the Court in *People v. Gant, supra,* in parallel circumstances (222 *N. W.* 2d at 786):

> The rule against using silence as evidence is designed to protect a defendant's Fifth Amendment right to remain silent. Where, however, he makes a statement voluntarily, or in response to police investigatory questioning, he has essentially waived his right to remain silent.

.The court there accordingly held the State entitled to cross-examine the defendant as to the variance between his statement to the police and his exculpatory testimony at trial.

A similar situation arose in the *A'gnellino* case, *supra.* Defendant had been tried and convicted for receiving stolen property. When the police searched his premises he explained his possession of the property to them in terms which implied he would not be surprised to be told the property was stolen because of the low price he paid for it. At trial he testified he had purchased the articles in the normal course of business. The prosecutor in summation commented upon the variation in the respective statements. After conviction in the state court, defendant sought federal *habeas corpus* relief on the ground his privilege to remain silent had been violated by the prosecutor's comments. In affirming a denial of relief, two of the three appellate judges rejected defendant's contention.[2] Chief Judge Seitz said (493 *F.* 2d at 729):

> His trial testimony essentially attempts to represent his purchase of these items as a 'course of business' transaction. This picture differs markedly from the impression conveyed by the statements the police officer testified that defendant made the night of his arrest

---

[2]Judge Hunter accepted defendant's argument that the comment had been on defendant's silence, but ruled against relief on the ground that once defendant testified his credibility was properly subject to attack by the comment as to his silence.

both in choice of words and in the details offered. The prosecutor's not unambiguous remarks appear to me to comment upon the differences in the statements made by defendant at trial and those made at the time of the arrest. Comment upon those differences, rather than upon defendant's silence, is permissible where credibility is in issue.

Judge Weis said (493 *F.* 2d at 730):

I do not see this as a case where the prosecutor commented unfavorably upon the defendant's 'silence.' The district attorney's remarks were focused upon the issue of the defendant's credibility, and the comments on variations between the tenor of his statements at time of arrest and the testimony at trial were proper.

A defendant who chooses to answer questions with *half truths* cannot claim constitutional protection to remain silent *as to the other half.* A complete answer to a question may be as inconsistent with a partial reply as one completely different in detail. When Agnellino chose to respond to police interrogation, he effectively waived his right to remain silent, at the very least, to the topics covered by the questioning. (emphasis added).

The principle that once a defendant speaks he waives his privilege against self-incrimination is fundamental and has been applied in numerous contexts. *McGautha v. California,* 402 *U. S.* 183, 215, 91 *S. Ct.* 1454, 28 *L. Ed.* 2d 711 (1971); *State v. Jamison,* 64 *N. J.* 363 (1974); *State v. Fary,* 19 *N. J.* 431, 435 (1955); *cf. United States v. Washington, —— U. S. ——,* 97 *S. Ct.* 1814, 52 *L. Ed.* 2d 238 (1977). Thus the defendant at bar clearly waived his privilege in relation to this episode once he voluntarily told the police he had shot the decedent. The State thereupon had every right to make any comment about that statement or omissions therefrom logically relevant to defendant's credibility in advancing the defense of self-defense. Our unanimous holding in *State v. Deatore, supra,* forbidding comment by the State on defendant's silence was expressly confined to silence, the opinion noting that the ruling was not applicable when the defendant made a statement. 70 *N. J.* at 108, 118–119.

## III

It remains to deal with the effect of *Doyle v. Ohio, supra.* The United States Supreme Court there held that where, upon arrest, the suspect is given *Miranda* warnings by the police and the defendant is silent thereafter, the State may not at trial comment upon the inconsistency between such silence and defendant's exculpatory testimony. The rationale was stated in terms of due process, it being thought fundamentally unfair to use defendant's silence against him when he had been expressly told he had the right to remain silent. *Doyle* does not control here for a number of reasons.

### A

In *Doyle,* defendant was silent before as well as after the *Miranda* warnings. Here, by contrast, defendant had made a voluntary incriminatory statement to the police before being given any warnings. The vested right of the State to comment on that statement so far as it bore on defendant's credibility at trial, as demonstrated in II, *supra,* could not be wiped out by a subsequent *Miranda* warning and defendant's silence thereafter.

### B

Although, technically, the prosecutor's comments and cross-examination could be understood to apply to the short period of time during the confrontation between Detective Friday and defendant, at the scene, after the alleged *Miranda* warnings, as well as before them, the gravamen of the prosecutor's remarks went to the absence from defendant's inculpatory statement or the story of the screwdriver attack. Thus, the prosecutor said:

> He didn't tell Detective Friday, the man on the scene, who would be the quickest way to get it [the screwdriver], and to preserve that evidence. *He told Detective Friday other things.* (emphasis added).

It would be highly unjust to the State, in view of the foregoing, to characterize the prosecutor's attack on defendant's credibility as solely or primarily, rather than purely incidentally, an invidious animadversion on defendant's silence between the time he (allegedly) received the warnings and his relation of the screwdriver story soon thereafter to the police on the way to the police station. Moreover, as noted above, defense counsel themselves did not regard it as such, and in fact on cross-examination required Detective Friday to repeat that defendant said nothing after receiving the warning.

## C

It is improper to assume conclusively, for purposes of this appeal, that defendant received *Miranda* warnings and that his subsequent silence was a response thereto. Defendant testified that he heard no such warnings. The *Doyle* rationale of fundamental unfairness in the State's references to defendant's silence *after* receiving such warnings is thus totally inapplicable to the factual situation here, as reflected by the defendant's own account as to what happened on the scene. The Appellate Division correctly made the same point. At the very least, if any doubt were harbored on the point, and it were deemed determinative of the case, it would obviously be the route of justice to remand the matter for a trial court finding on the fact in issue before reversing an otherwise just and unexceptionable conviction of the defendant.

## D

Even if the prosecutor's summation could be fairly regarded as aimed at the defendant's conduct after as well as prior to the time he received the warning (if he did), it was fully justified by the three separate attacks by the defense during summation on the failure of the police to look for the screwdriver at the scene, as well as in response to defendant's failure to testify, as it was represented on his

opening that he would, that he had told the police about the attack upon him as soon as they came on the scene. See *supra*.

*E*

Any residual error by the prosecutor, after considering the scope of his entirely legitimate comments on the differences between defendant's admission at the scene of arrest and his testimonial formulation of a defense at trial, should be regarded as harmless beyond a reasonable doubt. The overwhelming circumstantial picture from the proofs as a whole was contrary to defendant's attempt at a self-defense justification.[3] It is conceded in the *Doyle* opinion that the constitutional point there made would be subject to a showing of harmless error by the State. 426 *U. S.* at 619–620, 96 *S. Ct.* at 2245–2246, 49 *L. Ed.* 2d at 98–99.

By the same token, and for all the reasons already given, this is not a case of plain error, if error at all. It should also be noted that had the defense made timely objection the trial judge could have distinguished between comment and cross-examination addressed to defendant's statement and that addressed to his subsequent silence, and advised the jury accordingly.

The judgment of the Appellate Division should be affirmed.

Justice SULLIVAN and Justice SCHREIBER join in this opinion.

*For reversal and remandment*—Chief Justice HUGHES and Justices MOUNTAIN, PASHMAN and CLIFFORD—4.

*For affirmance*—Justices SULLIVAN and SCHREIBER and Judge CONFORD—3.

---

[3]In addition to the failure of anyone to see a screwdriver, there was impressive medical testimony that from the location of the bullet holes (in victim's back) and the course of the bullets, it was highly unlikely that defendant shot the victim facing him.