201 N.J. Super. 514 (1985)
493 A.2d 596
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
STEVEN MICHAEL MARKS, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued May 7, 1985.
Decided May 30, 1985.
*520 Before Judges MICHELS, PETRELLA and BAIME.
Francis J. Hartman argued the cause for appellant (Lois C. Williams, on the brief).
Nancy M. Falivena, Deputy Attorney General, argued the cause for respondent (Irwin I. Kimmelman, Attorney General of New Jersey, attorney; Nancy M. Falivena, of counsel and on the brief).
The opinion of the court was delivered by BAIME, J.A.D.
Defendant and his alleged accomplice, Barry Burton, were charged in a multi-count indictment with conspiracy (N.J.S.A. 2C:5-2), armed robbery (N.J.S.A. 2C:15-1), aggravated assault (N.J.S.A. 2C:12-1b(1) and (2)), possession of a handgun (N.J.S.A. 2C:39-5b), possession of a firearm for an unlawful purpose (N.J.S.A. 2C:39-4a), criminal restraint (N.J.S.A. 2C:13-2a) and attempted murder (N.J.S.A. 2C:5-1 and N.J.S.A. 2C:11-3). Burton subsequently entered a plea agreement with the State and ultimately testified against defendant. Following a protracted jury trial, defendant was convicted of conspiracy, second degree robbery, aggravated assault, criminal restraint and attempted murder. At sentencing, the trial judge merged the conspiracy count into defendant's robbery conviction and imposed a custodial term of seven years. Additionally, the court directed that defendant serve three years without parole eligibility. Defendant was sentenced to a consecutive term of seven years with respect to the aggravated assault conviction. The court imposed *521 a minimum term of one year during which defendant was not to be eligible for parole. Defendant was sentenced to a consecutive term of seven years with a three year parole disqualifier with regard to the conviction for attempted murder. On the criminal restraint conviction, the court imposed a concurrent four year sentence. Defendant was assessed a penalty of $500 payable to the Violent Crimes Compensation Board with respect to each conviction. Thus, the court imposed an aggregate term of 21 years imprisonment with a seven year period of parole ineligibility and a penalty totaling $2000.
Defendant advances numerous arguments on appeal. Initially, he contends that the trial judge erroneously refused to exclude his incriminatory statements made at the scene of the crimes and at police headquarters. He also argues that the prosecutor's statements during his summation infringed upon his Fifth Amendment privilege and otherwise exceeded the bounds of fair comment. Defendant claims that the trial judge erred in refusing to permit him to explain his reasons for declining to undergo a polygraph test with respect to a wholly unrelated incident. It is also argued that the court improperly precluded defendant's attorney from commenting upon the State's failure to produce an alleged key witness. Additionally, defendant claims that the trial judge committed reversible error when he failed to instruct the jury that each count of the indictment was to be considered separately and independently. Defendant further contends that the jury's verdict was against the weight of the evidence. Lastly, defendant asserts that the sentences imposed were manifestly excessive and unduly punitive. In essence, he claims that concurrent indeterminate terms should have been imposed.
We have carefully reviewed the record in light of the arguments advanced. We conclude that defendant received a fair trial and was properly convicted. Additionally, we are entirely satisfied that the sentences imposed by the trial judge did not constitute an abuse of discretion and were plainly warranted by virtue of the substantial aggravating factors apparent in the *522 record. Succinctly stated, we perceive no sound basis to disturb either the jury's verdict or the sentences imposed. We affirm.
At the outset we note that the evidence presented by the State at trial can fairly be characterized as overwhelming. In fact, the record literally reeks of defendant's guilt. The salient facts can be summarized as follows. For approximately a year prior to the crimes charged in the indictment, defendant was employed by George Koch, the owner of the Golden Hedge. The Golden Hedge was a family owned and operated store dealing in the sale and purchase of rare stamps and coins. Defendant was apparently the only non-familial full time employee working at the store. The record discloses that defendant was knowledgeable with respect to the value of rare coins and stamps. Apparently, both he and his father collected these items as a hobby. Defendant had long been a customer of the store prior to his employment.
It is unclear when defendant initially conceived the plan to rob the Golden Hedge. According to his friend and accomplice, Barry Burton, he first broached the subject in a casual manner during a conversation at Kaminski's Ale House, a local restaurant, in February 1983. Defendant advised Burton that there was a substantial quantity of gold and silver at the store and that it would be a relatively simple process to steal it in light of his knowledge of the alarm system and the owner's general habits.
It would appear that Burton was initially somewhat non-committal with respect to the proposed robbery. However, on March 7, 1983, defendant and Burton discussed the matter in some detail. The plan that emerged called for Burton to enlist the assistance of Merrill Giles in the project. Giles "was a power lifter" and was known for his size and strength. According to the plan, Giles was to enter the store and force the owner to open the safe. Burton was known by Koch to be an acquaintance of defendant. Therefore, it was important that he *523 not be exposed to Koch during the robbery. Rather, his role was to wait behind the store until the gold and silver had been removed from the safe. The stolen articles were then to be placed in Burton's automobile. Defendant was to be responsible for disposing of the coins and other items.
The plan was executed on April 7, 1983. At approximately 8:20 p.m. on that date, defendant and Koch were alone in the store preparing to close for the day. Koch recalled that defendant went to the window and then proceeded to the rear room of the store where he "disappeared." Shortly thereafter, a largely built black male, whom Koch subsequently identified as Giles, entered the store. After some initial inquiries, Giles produced a handgun from his jacket pocket and directed Koch to the safe. At that point, defendant appeared and asked the owner for the key to the front door. With the gun pointed at his back, Koch motioned toward his pocket. Defendant then removed the key, extinguished the lights and locked the front door. According to Koch, it was necessary for defendant to pass the alarm buttons in order to turn off the lights. Nevertheless, it is undisputed that defendant made no attempt to activate the burglar alarm. Approximately 30 seconds after locking the door, defendant returned. Giles then ordered Koch to open the safe and "not to turn around."
After opening the safe, the victim was ordered to walk to the center of the room where he was struck about the head and neck by either Giles, defendant or both. While lying on the floor, Koch was continually beaten. The victim heard defendant direct Giles to "clean out" the safe. Although severly beaten, Koch remained conscious. He was able to hear defendant implore Giles to "put a bullet in his head" and to "make sure" that he was dead. Each time this was said, the victim was struck about the head, neck and shoulders. Koch remained motionless on the floor pretending to be dead. On several occasions, either Giles or defendant "checked" to determine whether the victim was breathing. Koch "held his breath" in fear that they would shoot him were they to learn *524 that he was alive. During the course of the robbery, defendant ordered that the coins and other items be strewn about the room. Ultimately, Koch's hands were tied tightly behind him and he was dragged into a small lavatory at the rear of the store.
While lying on the bathroom floor, the victim heard the sounds of the safe being emptied. At one point, Koch heard a loud "banging" sound emanating from the back door. He next heard defendant say, "Barry, what took you so long? You're late." The victim was again struck on the back of his head with a blunt instrument. Although bleeding profusely, Koch remained conscious and heard the sound of "scuffling" in the next room. The victim then was able to hear defendant say, "[m]ake it look good. Don't hurt me." Defendant was placed in the bathroom. Koch, feeling progressively weaker and fearing defendant, continued to feign unconsciousness.
Approximately ten minutes later, the police arrived. Upon entering the rear of the store, the officers heard the "sounds of moaning" emanating from the bathroom. Upon opening the bathroom door, they observed the victim lying on the floor, his hands tied and his head "surrounded by a pool of blood." Defendant was found tied up and lying across Koch's ankles. One of the officers untied defendant's "loosely" bound feet.
Defendant left the bathroom and was briefly questioned by several of the police officers. He explained what had occurred and described the perpetrator as a "caucasion male, 30 to 32 years of age, 5'11" in height, wearing blue jeans and a plaid hunting jacket." Approximately five minutes later, when inferentially defendant first realized that Koch was alive and able to communicate, he advised the police that there had been a second suspect whom he described as a "well-dressed black man." When one of the officers arrived to "dust for fingerprints" defendant, without being questioned, volunteered that the perpetrators wore gloves. At one point, he asked a detective who had responded to the scene to inspect the injuries he *525 had allegedly sustained. The officer testified that he noticed "some redness" but there was no blood. Defendant repeatedly and adamantly refused medical attention.
In the meantime, other officers were administering first aid to the victim. Because the bathroom was so small, the police attempted to remove the door to provide greater access. Koch requested the officer to close the door and then advised him that defendant was involved in the robbery. He also noted that he had overheard defendant refer to one of his accomplices as "Barry." Koch advised the police that he knew "Barry" to be one of defendant's friends. He also alluded to the fact that Burton's father was a highly ranked police officer. At that point, Koch was transported to the hospital where he remained for a period of ten days.
The victim's account of the incident was substantially corroborated by Burton's testimony. He recounted the manner in which the robbery plan was conceived and executed. In that regard, he noted that defendant signaled from the window as the owner was preparing to close the store. After Giles had entered, Burton drove his automobile to the rear alleyway where he parked. Shortly thereafter, he entered the store through the unlocked rear door. As he walked into the room, Burton observed defendant with a handgun. Throughout the robbery, defendant beseeched Giles and Burton to shoot the victim claiming that "it was part of the deal." When the two refused, defendant threatened to kill Koch and ultimately had to be restrained. After the stolen items had been transported to his automobile, Burton departed. He subsequently learned that the police had become aware of his involvement. Pursuant to his father's advice, Burton surrendered with the stolen merchandise. After he was freed on bail, Burton met defendant who asked whether the gold and silver had been hidden.
Defendant elected to testify. He admitted knowing Burton, but denied being acquainted with Giles. Defendant maintained that Burton, while accompanying him on an errand, suggested *526 that they rob the Golden Hedge. According to defendant, he emphatically declined to participate. Later that day, defendant again met with Burton and instructed him not to return to the store. Defendant indicated that he would tell Burton's father or brother or the police about the proposed robbery. According to defendant, Burton responded that he would falsely implicate him in the robbery if their conversation was ever divulged.
Later that evening as he and Koch were closing the store, defendant allegedly heard someone enter. Thereafter, he observed a tall black male brandishing a handgun. The man instructed Koch to open the safe. He also ordered defendant to extinguish the interior lights and lock the front door. Defendant testified that he obtained Koch's keys and fully complied with the perpetrator's directions. He further claimed that as he returned he heard the back door open. Defendant then observed a white male wearing a red plaid jacket. At that point, defendant was allegedly struck on the back of his shoulder. When he regained consciousness, defendant found himself bound in the bathroom with Koch. Defendant was able to free his hands and, shortly thereafter, summoned the police.

I
Prior to trial, defendant moved to suppress evidence of his statements to the police at the scene, while being transported to headquarters and at the police station. Although the record is somewhat ambiguous, it would appear that six separate statements were given. At the scene, defendant initially described the perpetrator as a white male wearing a red plaid hunting jacket. Five minutes later, he gave another statement in which he indicated that there were two perpetrators. He then described a largely built, well-dressed black male as one of the suspects. Shortly thereafter, defendant observed the police inspecting the premises for fingerprints. At that point, he volunteered that the robbers had worn gloves. While being transported to police headquarters, defendant allegedly asked *527 one of the detectives whether he knew the Burton family. At trial, defendant testified that his inquiry was based upon his earlier conversation with Burton wherein the latter had allegedly threatened to falsely implicate him in the robbery. Defendant also gave a formal written statement at the police station. Finally, upon being apprised of his arrest, defendant expressed surprise and anger. Specifically, he told the arresting officer that "he was crazy" and asked "what was going on" and "how could he say that."
Defendant argues that the trial judge erred in denying his motion. The principal thrust of defendant's contention is that he was a prime suspect after Koch advised the police that he was one of the perpetrators of the robbery. He contends that from this point on he was the focus of the investigation, thereby triggering the requirement that he be advised of his right to remain silent and have an attorney present.
We disagree. The necessary predicate to defendant's argument is that the four-fold warnings set forth in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) are generated when a suspect becomes the "focus" of police investigation. However, that thesis was considered and rejected by our Supreme Court in State v. Graves, 60 N.J. 441 (1972) and State v. Williams, 59 N.J. 493 (1971). Miranda, in its own words, dealt with the admissibility of statements obtained from an individual who is "subjected to custodial police interrogation." Miranda v. Arizona, supra, 384 U.S. at 439, 86 S.Ct. at 1609, 16 L.Ed.2d at 704. Our Supreme Court has thus read Miranda "to apply only to such custodial interrogation by the police." State v. Williams, supra, 59 N.J. at 501, quoting from State v. McKnight, 52 N.J. 35, 54 (1968). "[T]he sense of Miranda is that `custodial interrogation,' rather than a mere `focus' upon a particular suspect," is the triggering event mandating warnings to an accused who might otherwise feel compelled to waive his constitutional rights. State v. Graves, supra, 60 N.J. at 448; State v. Williams, supra, 59 N.J. at 502, *528 n. 1. Thus, "custodial interrogation is the deciding factor in determining whether the Miranda warnings should be given." State v. Graves, supra, 60 N.J. at 448. See also Oregon v. Mathiason, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); State v. Lutz, 165 N.J. Super. 278, 284-285 (App.Div. 1979).
We are entirely satisfied that none of defendant's statements constituted the product of custodial interrogation. It is abundantly clear that defendant was not in custody when he initially purported to describe the perpetrators of the crime and when he volunteered the alleged fact that they wore gloves during the course of the robbery. Nor was he in custody when he asked the detective about the Burton family while being transported to police headquarters. It can hardly be said that defendant's freedom was restricted in any significant way when these statements were given. State v. Lutz, supra at 284-285; State v. Godfrey, 131 N.J. Super. 168, 175 (App.Div. 1974), aff'd 67 N.J. 267 (1975). Although the record is somewhat ambiguous with respect to whether defendant was in custody when he provided a formal statement at the police station, the issue is wholly irrelevant in light of the fact that the State did not seek to introduce this evidence. To the contrary, it was defendant who elicited this testimony.
Finally, defendant's expression of surprise when he was notified of his arrest did not constitute the product of custodial interrogation. Rather, this statement was volunteered and was not made in response to any question posed by the police. In Rhode Island v. Innis, 446 U.S. 291, 302-303, 100 S.Ct. 1682, 1690, 64 L.Ed.2d 297, 307-309 (1980), the United States Supreme Court reaffirmed the principle originally noted in Miranda that a freely volunteered statement is admissible notwithstanding the failure to advise the suspect of his constitutional rights. There, the Court stated "that the special procedural safeguards outlined in Miranda are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation." 446 U.S. at *529 300, 100 S.Ct. at 1690, 65 L.Ed.2d at 307. As conceptualized in Miranda, interrogation "must reflect a measure of compulsion above and beyond that inherent in custody itself." Ibid. See also State v. Gallicchio, 51 N.J. 313, 321 (1968), cert. den. 393 U.S. 912, 89 S.Ct. 233, 21 L.Ed.2d 198 (1968); State v. Gosser, 50 N.J. 438, 445-446 (1967), cert. den. 390 U.S. 1035, 88 S.Ct. 1434, 20 L.Ed.2d 295 (1968); State v. Elysee, 159 N.J. Super. 380, 387 (App.Div. 1978). In the absence of interrogation, a spontaneous statement is admissible in evidence regardless of the failure to provide Miranda warnings. These principles are clearly applicable here. Defendant's volunteered statement was not the product of custodial interrogation.[1]Cf. State v. Barnes, 54 N.J. 1, 6 (1969), cert. den. 396 U.S. 1029, 90 S.Ct. 580, 24 L.Ed.2d 525 (1970); State v. Sessions, 172 N.J. Super. 558, 563 (App.Div. 1980), certif. den. 85 N.J. 108 (1980); State v. Mann, 171 N.J. Super. 173, 177-178 (App.Div. 1979), certif. den. 82 N.J. 290 (1980).

II
We next turn to defendant's contention that the prosecutor's statements in summation exceeded the bounds of fair comment. Defendant's attack is two-fold. First, he argues that the prosecutor improperly referred to his silence upon being informed of his arrest. Second, it is claimed that the prosecutor's allusion to "Judas" in describing defendant's betrayal of his employer had anti-Semitic overtones and, therefore, deprived him of a fair trial. We will review these contentions seriatim.

i
As noted previously, defendant testified on direct examination that Burton had suggested robbing the Golden Hedge. *530 Defendant allegedly responded that he would not participate and that he would contact Burton's brother, father or the police. At that point, Burton allegedly replied that he would falsely implicate defendant in the robbery if the latter disclosed the plan to members of his family or to the police. Immediately prior to his arrest, defendant told one of the officers that he had provided the police with "all the information" known by him. He, thereafter, requested to leave, noting that "if [he] could think of any more information" he would contact the authorities. The officer then advised defendant that he was under arrest. On cross-examination, defendant noted that he was shocked at this development and asked the officer whether "he was crazy" or "what was going on" or "how could he say that." Defendant went on to note that he did not advise the police of Burton's plan to rob the Golden Hedge.
During his summation, the prosecutor attacked defendant's credibility. In that context, he observed that defendant never apprised the police of his conversations with Burton wherein the latter had described his plan to rob the Golden Hedge. Nor did he advise the authorities of Burton's threat to falsely implicate him in the robbery were he to divulge their conversation. Rather, defendant had expressed surprise upon his arrest and, according to the prosecutor, had remained "stone silent." Citing State v. Deatore, 70 N.J. 100 (1976) and State v. Lyle, 73 N.J. 403 (1977), defendant argues that the prosecutor's comment constituted an improper reference to his Fifth Amendment privilege against self-incrimination.
In both cases, our Supreme Court addressed the question whether the State's use of a defendant's post-arrest silence for the purpose of impeaching his exculpatory defense violates due process. The Court observed that a defendant is under no obligation to volunteer to the authorities at the first opportunity the exculpatory story he later tells at trial and, thus, "cannot be penalized directly or indirectly if he does not." State v. Deatore, supra, 70 N.J. at 115. Consequently, the Court held that a defendant's post-arrest silence could not be used to *531 impeach his later exculpatory testimony at trial. Although the United States Supreme Court subsequently adopted a somewhat similar position in Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the conclusion in Deatore, supra, was reached "as a matter of state law and policy" as to which stricter standards and controls may be imposed. State v. Deatore, supra, 70 N.J. at 112.[2]
The facts here differ. We are not concerned with an accused's post-arrest silence. Simply stated, defendant did not remain silent upon being informed of his arrest. Rather, defendant registered his surprise. Defendant's exclamation of shock strains credulity particularly in light of his testimony pertaining to Burton's explicit threat, made earlier the same day, to falsely implicate him in the robbery. To that extent, a cogent argument can be made that the prosecutor's reference was not designed to draw meaning from silence, but to rhetorically elicit an explanation for a prior inconsistent statement. See, e.g., Anderson v. Charles, 447 U.S. 404, 409, 100 S.Ct. 2180, 2182, 65 L.Ed.2d 222, 227 (1980); Grieco v. Hall, 641 F.2d 1029, 1034-1036 (1 Cir.1981); United States v. Agee, 597 F.2d 350, 354-356 (3 Cir.1979) (en banc), cert. den. 442 U.S. 944, 99 S.Ct. 2889, 61 L.Ed.2d 315 (1979); United States v. Goldman, 563 F.2d 501, 503-504 (1 Cir.1977), cert. den. 434 U.S. 1067, 98 S.Ct. 1245, 55 L.Ed.2d 768 (1978). Defendant's failure to apprise the police of his conversation with Burton and the latter's threat can perhaps be considered a material omission in *532 a prior inconsistent statement affecting his credibility as a witness. Cf. State v. Williams, 182 N.J. Super. 427, 433-434 (App.Div. 1982); State v. Provet, 133 N.J. Super. 432, 437-438 (App.Div. 1975), certif. den. 68 N.J. 174 (1975). See also IIIA Wigmore, Evidence § 1042, pp. 1056-1061 (Chadbourn rev. 1970). Once a defendant makes post-arrest statements that may arguably be inconsistent with his exculpatory trial testimony, we do not read State v. Deatore, supra, and State v. Lyle, supra, as barring all inquiry pertaining to material omissions. See State v. Deatore, supra, 70 N.J. at 108; State v. Manning, 165 N.J. Super. 19, 34 (App.Div. 1978), rev'd on other grounds 82 N.J. 417 (1980). See also Oregon v. Hass, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975); Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971); State v. Burt, 59 N.J. 156 (1971), cert. den. 404 U.S. 1047, 92 S.Ct. 728, 30 L.Ed.2d 735 (1972); State v. Kimbrough, 109 N.J. Super. 57, 65-68 (App.Div. 1970). "Each of two inconsistent descriptions of events may be said to involve `silence' insofar as it omits facts included in the other version." Anderson v. Charles, supra, 447 U.S. at 409, 100 S.Ct. at 2182, 65 L.Ed.2d at 227. In our view, Deatore, supra, and Lyle, supra, do not require any such formalistic understanding of "silence," and we find no reason to adopt such a view in this case. See Anderson v. Charles, 447 U.S. at 409, 100 S.Ct. at 2182, 65 L.Ed.2d at 227.[3]
*533 We need not dwell on the issue, however. Our review of the record convinces us that the prosecutor's brief and isolated allusion to defendant's failure to apprise the police of exculpatory facts later described at trial was completely harmless and had no impact upon the jury's deliberations. We emphasize that the entire incident occupied only several lines in the transcript of a lengthy trial. As noted previously, the proof of guilt was very strong. In the overall picture, we are satisfied that the error, if any, was harmless beyond a reasonable doubt and cannot be said to have influenced the verdict. State v. Whitehead, 80 N.J. 343, 348 (1979); State v. Alston, 70 N.J. 95, 98 (1976).
We note in that regard that defense counsel did not interpose a timely objection. The significance of counsel's failure to object was dealt with at length in State v. Macon, 57 N.J. 325 (1971). In addition to giving the trial judge an opportunity to *534 take corrective action, "a timely objection signifies that the defense believes itself to have been prejudiced by the prosecutor's remarks." State v. Wilson, 57 N.J. 39, 51 (1970). Conversely, a failure to object reveals that "in the atmosphere of the trial the defense did not believe that the prosecutor's [comments] were prejudicial." Ibid. Our careful examination of the record convinces us beyond any doubt that the prosecutor's fleeting allusion to defendant's omission in no sense deprived the latter of a fair trial.

ii
We are equally unpersuaded by defendant's argument that he was unduly prejudiced by the prosecutor's reference to "Judas." Contrary to defendant's assertion, we are convinced that the prosecutor's remarks did not have any anti-Semitic connotation and could not have been so understood by the jury. It is axiomatic that a prosecutor is duty-bound to confine his summation to facts revealed during the trial and the reasonable inferences which may be properly drawn therefrom. State v. Bogen, 13 N.J. 137, 140 (1953), cert. den. sub nom. Lieberman v. State, 346 U.S. 825, 74 S.Ct. 44, 98 L.Ed. 350 (1953). His comments, by way of denunciation or appeal, will afford no grounds for reversal if merely descriptive of the proofs adduced at trial. State v. Mayberry, 52 N.J. 413, 437, 440 (1968).
Of course, we recognize that a prosecutor "is entitled to sum up the State's case graphically and forcefully." State v. Johnson, 31 N.J. 489, 510-511 (1960). See also State v. Wilson, 57 N.J. 39, 50 (1970). A criminal trial is "a swiftly moving dramatic contest which often evokes strong emotions in the participants." State v. Bucanis, 26 N.J. 45, 56 (1958), cert. den. 357 U.S. 910, 78 S.Ct. 1157, 2 L.Ed.2d 1160 (1958). It is, thus, unreasonable to expect that criminal trials will be conducted without some show of feelings. "Defense counsel traditionally make dramatic appeals to the emotions of the jury" and under *535 such circumstances "a prosecutor cannot be expected to present the State's case in a manner appropriate to a lecture hall." State v. Johnson, supra, 31 N.J. at 510-511. We are not unmindful of the fact that the emotionally charged atmosphere created "frequently makes it arduous for the prosecuting attorney to stay within the orbit of strict propriety." State v. Bucanis, supra, 26 N.J. at 56.
The controlling principle is clear. It is incumbent upon the prosecutor to put aside any tendency or inclination to stray beyond the bounds of fair play. Even in the face of provocation by an errant defense attorney, we stress the obligation of the prosecutor to avoid retaliation. "He may parry impropriety by the defense and seek the ruling of the court to eradicate it, but he may not retaliate with improprieties of his own." State v. West, 29 N.J. 327, 338 (1959). The prosecutor is not simply another attorney who happens to represent the State. As the representative of the State, his obligation to play fair is as compelling as his responsibility to protect the public. Expressed another way, his interest is not that the government shall prevail in a criminal case, "but that justice shall be done." Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314, 1321 (1935). See also Canon 5 of the Canons of Professional Ethics. "He may prosecute with earnestness and vigor  indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones." Berger v. United States, 295 U.S. at 88, 55 S.Ct. at 633, 79 L.Ed. at 1321. We again point out that our courts have not been loathe to reverse convictions based upon prosecutorial misconduct. See, e.g., State v. Farrell, 61 N.J. 99 (1972); State v. Welsch, 29 N.J. 152 (1959); State v. Siciliano, 21 N.J. 249 (1956); State v. D'Ippolito, 19 N.J. 540 (1955); State v. Bogen, supra.
Here, we are satisfied that the prosecutor's comment was not so grievous as to infect the fairness of the trial. It cannot be said that defendant was denied a fair trial or that the alleged dereliction led to an unjust result. We note that the *536 theme of betrayal was initially injected in the trial by defense counsel. During his cross-examination of the victim, counsel repeatedly referred to Koch's feelings of resentment against defendant as affecting his credibility and coloring his testimony. Defense counsel hypothesized that the victim felt betrayed by defendant and, thus, harbored a strong motivation to insure his conviction. At one point, defense counsel referred to Koch as Caesar and defendant as Brutus. Under these circumstances, we are convinced that the prosecutor's statement could not have been misconstrued by the jury particularly in light of the trial court's instructions that the attorneys' statements did not constitute evidence. We discern no sound reason to reverse defendant's conviction on this basis.

III
The remaining arguments advanced by defendant pertaining to the court's alleged trial errors are clearly without merit and do not require extended discussion. R. 2:11-3(e)(2).
We do not perceive any error in the trial judge's refusal to permit defendant to explain his reasons for not undergoing a polygraph test. During his cross-examination of the victim, defense counsel posed questions regarding an earlier incident at the Golden Hedge in which a shipment of approximately $4,500 in merchandise had been lost in the mail. As a result, the postal authorities commenced an investigation during which defendant refused to submit to a polygraph test. It is to be noted that the State did not elicit any testimony during the victim's direct examination concerning either the polygraph test or the unrelated incident. Rather, it was defense counsel who chose to explore this area in some detail. Defense counsel again raised these issues during defendant's direct testimony. The trial judge sustained the prosecutor's objection when defendant was asked why he refused to take a polygraph test. In our view, the issue was wholly collateral. Had defendant been permitted to explain his reason for refusing to undergo a *537 polygraph examination, the State was apparently prepared to present rebuttal evidence. We are fully convinced that the trial judge properly sustained the State's objection.
Equally without merit is defendant's argument that the trial judge erred when he refused to permit defense counsel to comment upon the State's failure to produce Giles as a witness. We note that defendant failed to apprise the prosecutor of his intention to advance this argument. Contrary to defendant's contention, State v. Carter, 91 N.J. 86, 128 (1982) mandates that counsel make his intention known to his adversary out of the presence of the jury at the close of the latter's case. In any event, we agree with the trial judge that Giles was equally available to both parties and that his testimony would have been cumulative.
Also without basis is defendant's contention that the verdict was against the weight of the evidence. R. 2:10-1 clearly precludes appellate review of an evidentiary challenge to a jury verdict unless the defendant has timely moved for a new trial on that basis. See State v. McNair, 60 N.J. 8, 9 (1972). Moreover, the jury's verdict was amply supported by the evidence. State v. Sims, 65 N.J. 359, 373-374 (1974). See also Carrino v. Novotny, 78 N.J. 355, 360-361 (1979); Dolson v. Anastasia, 55 N.J. 2, 6-8 (1969).
We also reject defendant's assertion that the trial judge failed to apprise the jury of their responsibility to consider each count of the indictment separately. The verdict sheet and interrogatories propounded by the judge coupled with the court's instructions were sufficient in that regard. The jury's verdict, finding defendant guilty with respect to several counts and not guilty as to others, clearly evidences the fact that each charge was separately considered.

IV
Finally, we perceive no sound reason to disturb the sentences imposed. In State v. Roth, 95 N.J. 334, 365-366 *538 (1984), our Supreme Court delineated the scope of appellate review concerning sentencing decisions. Under the tripartite test enunciated by the Court, we are to consider whether the correct sentencing guidelines and presumptions have been followed. Further, we must explore whether there is substantial evidence in the record to support the findings of fact upon which the sentencing court based the application of these guidelines. Lastly, we are to determine whether the trial court clearly erred "by reaching a conclusion that could not have reasonably been made upon a weighing of the relevant factors." Id. at 366.
Applying these principles, we are fully satisfied that the trial judge meticulously adhered to the appropriate standards and guidelines, and applied them in a fair and reasonable manner. We note that defendant's convictions for robbery, aggravated assault and attempted murder all involved second degree crimes. Therefore, the presumption of imprisonment was fully applicable. N.J.S.A. 2C:44-1d. Imposition of three consecutive sentences was clearly within the permissible sentencing range.
We are equally convinced that the aggravating factors so substantially outweighed any mitigating circumstances as to compel imposition of parole ineligibility terms. N.J.S.A. 2C:43-6b. Defendant does not contend here that imposition of presumptive sentences was inconsistent with the requirement that defendant serve portions of such terms without the possibility of parole. See State v. Guzman, 199 N.J. Super. 346, 489 A.2d 724 (Law Div. 1985).[4] Thus, we have no occasion to address *539 that issue. In any event, the court's finding that the aggravating factors substantially outweighed any mitigating circumstances was amply supported by sufficient credible evidence contained in the record.
Moreover, we reject defendant's contention that the trial judge erroneously considered the weapons charges for which the jury rendered an acquittal. Although defendant was acquitted of the weapons offenses, he was convicted of attempted murder. In our view, defendant's expressed desire to kill the victim was properly considered by the trial court. That defendant apparently did not use a weapon is largely inconsequential. Assuming that the trial judge's reference to "a bullet" was improper, we perceive nothing which could discount or diminish the serious nature of the crime as an aggravating factor.
So too, we are satisfied that the trial judge did not abuse his discretion in imposing consecutive sentences. We note that the Code of Criminal Justice is totally silent with respect to the standards and criteria applicable to such a sentencing decision. The issue is presently before our Supreme Court. See State v. Yarbough, 195 N.J. Super. 135, 144 (App. Div. 1984), certif. granted 99 N.J. 195 (1984). Suffice it to say here, defendant's callous conduct plainly warranted consecutive sentences within the context of the aggravating factors found to be present. In our view, the trial court properly exercised its discretion in that regard.
One further matter deserves some comment. The trial judge briefly alluded to defendant's failure to express remorse for his role in committing the offenses for which he was convicted. In State v. Poteet, 61 N.J. 493, 497 (1972), our Supreme Court observed that "when the defendant has already *540 been convicted, an admission of guilt is of doubtful value." Generally, "a confession at that point is of little rehabilitative significance." Ibid. Hence, the Court expressed its disapproval of the practice of "calling routinely upon defendants at sentencing to disavow their stance of innocence." Id. at 498. We are of the view that a defendant's refusal to acknowledge guilt following a conviction is generally not a germane factor in the sentencing decision. See, e.g., N.J.S.A. 2C:44-1c(1).
Here, the trial judge's brief allusion to defendant's failure to candidly admit his guilt does not require a reversal. In point of fact, defendant ultimately confessed his role in the crimes to his psychiatrist. The trial court expressly referred to that fact. In sum, we are satisfied that defendant was not in any sense prejudiced.

V
We have carefully considered all of defendant's arguments in light of the record. We conclude that defendant received a fair trial. Accordingly, the judgments of conviction and sentences imposed are affirmed in all respects.
NOTES
[1] We note further that these principles are controlling with respect to defendant's volunteered statement concerning the perpetrators wearing gloves and his subsequent conversation with a police officer in which he asked whether the latter knew the Burton family. These statements were made spontaneously and, as noted, defendant was not in custody.
[2] The United States Supreme Court's holding was limited to those situations in which the defendant's silence (in the form of failure to utter an exculpatory statement in circumstances where, the prosecution would argue, such explanation might reasonably be expected) occurs following receipt of the warnings required by Miranda v. Arizona, supra. See Fletcher v. Weir, 455 U.S. 603, 605-606, 102 S.Ct. 1309, 1311, 71 L.Ed.2d 490, 493-494 (1982). Our Supreme Court's decision in State v. Deatore, supra, 70 N.J. at 117, n. 10, is not so limited. In Deatore, supra, the Court stated, "[we] think the rule of impropriety of cross-examination of a defendant with respect to silence in police custody ... should not depend on whether or not the defendant received his Miranda warnings." Ibid. See also State v. Lyle, supra, 73 N.J. at 410.
[3] We do not suggest that every statement and utterance by a defendant upon his arrest necessarily opens the door to full cross-examination pertaining to exculpatory facts not then disclosed but subsequently described in his trial testimony. We recognize that the defendants in Doyle v. Ohio, supra, State v. Deatore, supra, and State v. Lyle, supra, did not remain entirely silent upon their arrests. In State v. Deatore, supra, defendant testified that he had merely requested a receipt for the money taken by the police from his person when he was arrested. In State v. Lyle, supra, defendant advised the police that he had shot the victim. At no time did he mention that the killing was in self-defense, as he subsequently claimed at trial. In Doyle v. Ohio, supra, the defendant's statements were very similar to those made here. There, one defendant said nothing at all. The other asked the arresting officer "what's this all about?" 426 U.S. at 615, n. 5, 96 S.Ct. at 2243, n. 5, 49 L.Ed.2d at 97, n. 5. When told the reason for his arrest, he exclaimed "you got to be crazy" or "I don't know what you're talking about." 426 U.S. at 622-623, n. 4, 96 S.Ct. at 2247 n. 4, 49 L.Ed.2d at 101, n. 4 (Stevens, J., dissenting). Nevertheless, our Supreme Court in State v. Deatore, supra, 70 N.J. at 108, framed the issue in terms of whether post-arrest silence could be used to attack the credibility of a defendant who subsequently provided exculpatory facts at trial. Similarly, the Court in State v. Lyle, supra, 73 N.J. at 409, phrased the question presented as whether the State's use of defendant's post-arrest silence for the purpose of impeaching his exculpatory defense violates due process. So too, both the majority and dissenting opinions in Doyle v. Ohio, supra, analyzed the due process question as if both defendants remained silent. "The issue was said to involve cross-examination of a person who `does remain silent' after police inform him that he is legally entitled to do so." Anderson v. Charles, supra, 447 U.S. at 407, n. 2, 100 S.Ct. at 2182, n. 2, 65 L.Ed.2d at 226, n. 2.

In all three cases, the defendants' silence was equivocal and ambiguous. Here, the failure to apprise the police of Burton's plan to rob the Golden Hedge and, more particularly, his alleged threat to falsely accuse defendant appear to be directly inconsistent with the latter's exclamation of shock and surprise upon his arrest. It bears repeating that, according to defendant's trial testimony, he had been advised only hours before the robbery of Burton's threat to falsely implicate him in the crime. His expression of surprise upon being arrested coupled with his failure to apprise the officer of Burton's threat can fairly be characterized as a material omission inconsistent with his trial testimony.
[4] N.J.S.A. 2C:44-1f provides that the presumptive sentence is to be imposed unless the preponderance of aggravating or mitigating factors weighs in favor of a higher or lower term. N.J.S.A. 2C:43-6b provides that a parole ineligibility term may be imposed "where the court is clearly convinced that the aggravating factors substantially outweigh the mitigating factors...." In State v. Guzman, supra, it was suggested a presumptive sentence implied that aggravating and mitigating factors are in equipoise and, thus, a parole ineligibility term could not logically be imposed. As noted above, we have no occasion to consider that question here because it has not been raised.