**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2581-21

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JOHN L. CURTIN,

    Defendant-Appellant.

_____

Argued March 5, 2024 – Decided August 6, 2024

Before Judges Rose and Perez Friscia.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 18-10-1393.

Marcia H. Blum, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer Nicole Sellitti, Public Defender, attorney; Marcia H. Blum, of counsel and on the brief).

Alecia Nathanne Woodard, Assistant Prosecutor, argued the cause for respondent (Raymond S. Santiago, Monmouth County Prosecutor, attorney; Alecia Nathanne Woodard, of counsel and on the brief).

PER CURIAM

A jury convicted defendant John L. Curtin of felony murder, aggravated manslaughter, armed robbery, and weapons offenses for the shooting death of Evan Smutz during a drug deal in the victim's Keyport apartment.[1] Defendant was nineteen years old at the time of the shooting; Smutz was twenty. Defendant was sentenced to an aggregate prison term of forty years, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, on the felony murder conviction. Pertinent to this appeal, the trial court failed to merge the aggravated manslaughter conviction with the murder conviction and sentenced defendant to a concurrent twenty-five-year prison term, subject to NERA.

During the multi-day trial, the State presented the testimony of lay and expert witnesses, and introduced into evidence several exhibits, including a surveillance video recording that depicted defendant arriving outside Smutz's residence before the shooting and leaving from the scene thereafter. But the

---

[1] More particularly, defendant was convicted of all five counts charged in a Monmouth County indictment: first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1), as a lesser-included charge of murder, N.J.S.A. 2C:11-3(a)(1), and (2); first-degree felony murder, N.J.S.A. 2C:11-3(a)(3); first-degree armed robbery, N.J.S.A. 2C:15; second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1); and second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b).

case turned on the competing testimony of the only two surviving eyewitnesses: Smutz's live-in girlfriend, Anne Marie Palmiotto; and defendant, who testified on his own behalf.

Defendant now appeals, arguing:

POINT I

THE CONVICTIONS FOR ROBBERY AND FELONY MURDER PREDICATED ON ROBBERY MUST BE REVERSED BECAUSE THE INSTRUCTION ON ROBBERY FAILED TO EXPLAIN, AS SET FORTH IN THE MODEL CHARGE, THAT TO BE GUILTY OF ROBBERY, THE DEFENDANT MUST HAVE FORMED THE INTENT TO COMMIT THEFT BEFORE OR DURING, BUT NOT AFTER, HE USED FORCE AGAINST THE VICTIM.
[(Not Raised Below)][2]

POINT II

THE PROSECUTOR COMMITTED REVERSIBLE ERROR WHEN HE ATTACKED DEFENDANT'S CREDIBILITY BY CALLING ATTENTION TO THE FACT THAT, IN ACCORDANCE WITH HIS CONSTITUTIONAL RIGHTS, DEFENDANT ATTENDED THE TRIAL AND HEARD THE TESTIMONY AND EVIDENCE.
(Not Raised Below)

---

[2] Defendant's point heading cites the charge conference during which the parties objected to the inclusion of certain other language contained in the model jury charge on robbery, see Model Jury Charges (Criminal), "Robbery in the First Degree (N.J.S.A. 2C:15-1)" (rev. Sept. 10, 2012), but not the specific provision challenged on appeal.

POINT III

BECAUSE THERE WAS A SINGLE HOMICIDE, THE CONVICTION FOR AGGRAVATED MANSLAUGHTER SHOULD HAVE MERGED INTO THE CONVICTION FOR FELONY MURDER.

POINT IV

THE SENTENCE OF [FORTY] YEARS, [THIRTY-FOUR] YEARS WITHOUT PAROLE, IS EXCESSIVE FOR THIS OFFENSE AND THIS [NINETEEN]-YEAR-OLD DEFENDANT.

With the exception of the merger issue raised in point III, we reject defendant's contentions and affirm.

The State having conceded the merger issue asserted in point III, we remand for entry of an amended judgment of conviction (JOC), merging defendant's aggravated manslaughter conviction with his felony murder conviction, thereby vacating the sentence on the aggravated manslaughter conviction. See State v. Pantusco, 330 N.J. Super. 424, 444-45 (App. Div. 2000) (holding an "aggravated manslaughter conviction . . . merge[s] into the felony murder as there cannot be two homicide convictions for the death of one victim"). The amended JOC shall also remove: (1) the merged count from the list of final charges; and (2) the mistaken language referencing a plea agreement, i.e., "This was an agreement between the prosecutor and the defendant. The plea appears fair and in the interest of justice."

4

I.

Smutz and Palmiotto had been living together for a few months before the shooting. Palmiotto and defendant had attended the same middle school and had mutual friends. Palmiotto testified at trial Smutz sold marijuana and THC cartridges from their apartment "mostly every other day." Smutz generally knew his customers; he had met defendant the previous year and "their brothers were friends."

On the morning of August 9, 2018, Smutz told Palmiotto defendant would stop by later that day to purchase three ounces of marijuana for $600. Before defendant arrived that afternoon, Smutz placed three bags, each containing about one ounce of marijuana, on the living room table. Palmiotto was in the bathroom bathing her dog when she heard defendant arrive. Around five minutes later, Smutz walked past the bathroom into the couples' bedroom and retrieved THC cartridges. Palmiotto assumed defendant asked to purchase the cartridges in addition to the prearranged marijuana.

Shortly thereafter, Smutz called Palmiotto's name, sounding "weird," and asked her to come to him. "[P]eek[ing] [her] head out the bathroom," Palmiotto saw defendant pointing a gun at Smutz, who was sitting on the ottoman. Palmiotto was "confused," "scared," and "shocked"; she had never before seen

5

a gun.  The marijuana was "no longer on the table"; the THC cartridges were "gone."

At Smutz's direction, Palmiotto ran and "stood in front of the door" and locked it while defendant and Smutz argued.  When defendant moved toward Palmiotto, Smutz stood up and the men continued arguing:  "[Smutz] kept asking, 'Why are you doing this?' [Defendant] kept saying, 'This is what I do. This is what I got to do.'"  Smutz refused defendant's repeated demands for his cellphone.  Palmiotto interjected, asking defendant, "Why would we call the cops on you for stealing our weed?"  Palmiotto told the jury "[defendant] really wanted [Smutz]'s phone for some reason."  The argument ensued.  "Everybody [w]as screaming."  Defendant "fire[d] a shot past [Smutz]," which missed Smutz and struck the bathroom door.

Palmiotto attempted "to run past [defendant]" and "was gonna grab [Smutz]," but "[defendant] grab[bed] [her] from behind and then slam[med] [her] on the ground."  Smutz "tackle[d] both of [them]."  All three were piled on the ground – defendant on the bottom, Palmiotto in the middle, and Smutz on top.  Defendant remained armed.  Palmiotto "hear[d] two shots."  Defendant "started to get up"; Smutz was "in a push-up position"; Palmiotto "slid[] out from underneath [Smutz]."  Palmiotto observed one gunshot wound in Smutz's

6

back and another in his stomach. Defendant fled the apartment with the gun in hand.

During Palmiotto's direct examination, the State played the 9-1-1 call she made immediately after the shooting. Pursuant to the dispatcher's instructions, Palmiotto attempted to stop the bleeding and administer CPR, but Smutz was not breathing and "turning purple." Palmiotto told the dispatcher she had "never" before seen the shooter, but he had requested to "use the bathroom" and "seemed nice," so she and Smutz permitted him to "use the phone." Palmiotto described the shooter as a white male, around twenty-five years old, wearing a white shirt. She did not identify him by name.

Police arrived while Palmiotto was speaking with the dispatcher and placed her in the bedroom while they attempted lifesaving measures on Smutz. While alone in the bedroom, Palmiotto deleted text messages from Smutz's phone, fearing she and Smutz would "get in trouble for selling weed."

Police brought Palmiotto to headquarters for a formal interview. Advised that Smutz had died from his injuries, Palmiotto could not stop vomiting, had "anxiety attacks," and "wasn't able to talk." Eventually, she gave police defendant's name because "there [was] nothing to hide" after she "realize[d]" Smutz was "gone."

A-2581-21

At trial, Palmiotto acknowledged she had made untruthful statements during the investigation. But she returned to police headquarters the day after the shooting and gave "the full story": "who did it; why it happened; and that [she and Smutz] were selling weed." Palmiotto explained she returned to headquarters after having "processed what just happened."

According to defendant, Smutz initially intended to bring the drugs to his house, but defendant changed the plan because he "didn't really know" or "trust" Smutz. According to their series of text messages, Smutz "offered to drive the marijuana" to defendant, and defendant stated he'd "come down and jump in" Smutz's car, but defendant later became "uncomfortable with" that plan. Smutz thereafter gave defendant his address and "told [him] to come over."

Defendant's testimony aligned with Palmiotto's regarding the price and quantity of the arranged marijuana sale. But defendant claimed he weighed the marijuana and it was "about twenty-some grams" short. So, he "took about $150 back from the table" and put the weed "in [his] bookbag." Smutz became "kind of angry" and demanded the full $600. Palmiotto "grabbed the money off of the table" and "went in front of the door and locked it" at Smutz's direction. Smutz told defendant he "wasn't leaving until [defendant] paid the [full $]600." Defendant responded, "give me all the money back and I'll give all the weed

back." Smutz and Palmiotto "kind of . . . refus[ed]" defendant's multiple demands to leave unless he paid $600. Defendant displayed the handle of his pistol, claiming he brought the handgun for protection because he: "didn't really know [Smutz]"; "didn't really trust [Palmiotto]"; and had "been beaten up and robbed before."

Asserting he had no intention to fire the weapon when he entered the apartment, defendant testified "a shot went off" when Smutz grabbed him. They then "wrestl[ed] over the gun," with Smutz atop defendant. "At some points," both men had "hands on the gun," then defendant "lost control . . . for a quick second, and as [he] was trying to get it back, another shot went off." During the struggle, Palmiotto was "not on the floor" with the men, but "standing up" and "hitting [defendant] in the back of [his] head." Smutz "got off" defendant "at some point" and "let [defendant] up." Defendant "ran out of the house" with his bookbag, containing the three bags of marijuana and scale. He claimed Palmiotto took the $450 he had placed on the table. He denied that he intended to purchase THC cartridges.

Defendant stashed the handgun in a certain spot by the Keansburg beach because he "d[id]n't really like keeping it in [his] house." That same day, he saw a Twitter article about the shooting. Fearing he would be arrested,

9

defendant "took a train to New York" to stay with family. En route, however, defendant regretted his actions and turned himself into New York authorities, who brought him back to New Jersey. Defendant directed the police to the stash location. Police seized the handgun, which was admitted into evidence at trial.

## II.

For the first time on appeal, defendant challenges the adequacy of the final robbery charge. Citing our Supreme Court's decision in State v. Lopez, 187 N.J. 91 (2006), defendant contends the trial court failed to issue "an[] instruction explaining the requisite relationship between the defendant's use of force and the formulation of his intention to steal."

In Lopez, the State presented evidence at trial that the defendant attacked the victim, stole his jewelry, "and left him to die." Id. at 93. Conversely, the defendant claimed the men brawled, the victim struck first, the defendant retaliated, and the victim "fell face down into the water." Ibid. The "[d]efendant then decided to steal [the victim]'s necklace, and took it from his neck." Ibid.

Our Supreme Court held "our [robbery] statute requires that the threats or violence be carried out in furtherance of the intention to commit a theft. Indeed, the sequence of events is critical; the intention to steal must precede or be coterminous with the use of force." Id. at 101. The Court thus held our robbery

statute does not encompass "afterthought robbery." Ibid. Accordingly, when "a violent fracas occurs for reasons other than theft, and the perpetrator later happens to take property from the victim," the perpetrator is guilty of assault and theft, but not robbery. Ibid.

After the Court's decision in Lopez, the model jury charge on robbery was revised to reflect the following charge "if there is an issue regarding the timing of the use of force":

> To find the defendant guilty of robbery, the intent to commit theft must precede or be coterminous with the use of force. In other words, the defendant must have formed the intent to commit a theft before or during his/her use of force. If you find the defendant formed the intent to commit a theft after his/her use of force, then he/she cannot be found guilty of robbery.
>
> [Model Jury Charges (Criminal), "Robbery in the First Degree (N.J.S.A. 2C:15-1)" (rev. Sept. 10, 2012).]

Because defendant did not object to this optional portion of the jury charge at trial, we review his newly-minted challenges through the prism of the plain error standard. State v. Ross, 229 N.J. 389, 408 (2017). Accordingly, we will reverse the unchallenged jury instruction error only if it was "clearly capable of producing an unjust result." R. 2:10-2. "The mere possibility of an unjust result is not enough." State v. Funderburg, 225 N.J. 66, 79 (2016). We will only reverse if the error is "sufficient to raise 'a reasonable doubt . . . as to whether

the error led the jury to a result it otherwise might not have reached.'" <u>Ibid.</u> (alteration in original) (quoting <u>State v. Jenkins</u>, 178 N.J. 347, 361 (2004)).

Defendant acknowledges Palmiotto's testimony supports the jury's verdict that he "used forced to commit robbery." He further notes, at trial he "denied that he committed robbery or theft." But he now argues "the jury could have found from his testimony that he committed theft, but not robbery, on the ground that he did not use force to effectuate the theft." To support his argument, defendant now claims the jury could have determined "after he expended the force to free himself and was on his way out of the apartment, he decided to steal his captors' drugs and money." Neither Palmiotto's nor defendant's testimony supports his belated theory.

Moreover, the trial court instructed the jury that the State must prove beyond a reasonable doubt that "while in the course of committing the theft . . . defendant knowingly inflicted bodily injury or used force upon another, or . . . threatened another with or purposely put him in fear of immediate bodily injury." The court also instructed the jury that "an act is considered to be in the course of committing a theft if it occurs in an attempt to commit the theft, during the commission of the theft itself, or in immediate flight after the attempt or commission." Accordingly, the robbery instruction given sufficiently apprised

12

the jury how to consider the use of force in relation to commission of the theft. We therefore discern no plain error in the robbery charge issued.

III.

Defendant next argues the prosecutor committed reversible error during cross-examination by implying, because defendant "heard all the other witnesses, he could tailor his testimony accordingly." Citing our Supreme Court's decision in State v. Daniels, 182 N.J. 80 (2004), defendant contends the State violated "his right to attend his trial and tainted the jury's assessment of the evidence." Because defendant failed to object to the testimony he now challenges, we review for plain error. R. 2:10-2.

In Daniels, our Supreme Court found plain error where the prosecutor, in summation, commented on the defendant's ability to tailor his testimony by virtue of his presence at trial. 182 N.J. at 95. The Court distinguished between specific allegations of tailoring, where the record evidence "supports an inference of tailoring," and generic accusations, where the prosecutor without a "specific evidentiary basis that [the] defendant has tailored his testimony, nonetheless attacks the defendant's credibility by drawing the jury's attention to the defendant's presence during trial and his concomitant opportunity to tailor his testimony." Id. at 98 (emphasis added).

Noting the prosecutor fairly commented on the "too many coincidences" in the defendant's testimony, the <u>Daniels</u> Court determined the following comments exceeded fair comment: "[T]he defendant sits with counsel, listens to the entire case and he listens to each one of the State's witness[es], he knows what facts he can't get past. . . . But he can choose to craft his version to accommodate those facts." <u>Id.</u> at 101 (alteration in original). The Court concluded such comments are prohibited "even when the record indicates that [the] defendant tailored his testimony." <u>Ibid.</u>

Although not an issue in the case, the Court in <u>Daniels</u> further held: "For future guidance, the same analysis that we have provided for summations applies also to cross-examination. The foundational principle in that framework is that a prosecutor must have 'reasonable grounds' for posing questions during cross-examination that impugn a witness's credibility." <u>Id.</u> at 99 (quoting <u>State v. Rose</u>, 112 N.J. 454, 504 (1988)). The Court continued, "if there is evidence in the record that a defendant tailored his testimony, the prosecutor may cross-examine the defendant based on that evidence. However, at no time during cross-examination may the prosecutor reference the defendant's attendance at trial or his ability to hear the testimony of preceding witnesses." <u>Ibid.</u>

14 <span>A-2581-21</span>

Defendant argues the following exchange constitutes prohibited generic accusations of tailoring:

> [PROSECUTOR]: So, you had a chance to watch, you sat through the trial. Correct?
>
> [DEFENDANT]: Yes.
>
> [PROSECUTOR]: You heard all the testimony of all different witnesses. Right?
>
> [DEFENDANT]: Yes.
>
> [PROSECUTOR]: You had a chance to see all the evidence that was presented against you. Correct?
>
> [DEFENDANT]: Yes.

Defendant, however, fails to cite the exchange that immediately followed:

> [PROSECUTOR]: And one of the pieces of evidence was a video from an officer in Keyport from his house. Right?
>
> [DEFENDANT]: Yes.
>
> [PROSECUTOR]: You saw that video?
>
> [DEFENDANT]: Yes, sir.
>
> [PROSECUTOR]: This video depicts a kind of an older, kind of beat-up car drive both towards the street down where [Smutz] and [Palmiotto] lived and then back out again?
>
> [DEFENDANT]: Yes, sir.

15

> [PROSECUTOR]:  That's you in that car.  Correct?
>
> [DEFENDANT]:  Yes, sir.
>
> [PROSECUTOR]:  That's . . . Emily McCormick driving that car?

The prosecutor asked defendant additional questions about the video footage, establishing McCormick drove defendant to and from the scene, and defendant wrapped "[t]he gun that killed Evan Smutz" in the white T-shirt defendant had been wearing.

Spanning more than fifty transcript pages, the prosecutor's cross-examination is devoid of any questions suggesting defendant tailored his trial testimony to the evidence adduced by the State.  Instead, the questions defendant now challenges preceded the prosecutor's questions about defendant's actions depicted in the surveillance video.

We hasten to add, however, the prosecutor's inquiry concerning defendant's presence at trial and opportunity to observe the evidence adduced was out of bounds.  But the inquiry stopped short of a direct or an implied attack on defendant's credibility "and his concomitant opportunity to tailor his testimony."  Daniels, 182 N.J. at 98.  Moreover, the prosecutor made no remarks in summation that defendant tailored his testimony to the State's evidence adduced at trial.  See State v. Feal, 194 N.J. 293, 313 (2008) (declining to find

plain error where the prosecutor cross-examined the defendant, and commented in summation, about his presence in the courtroom where the "defendant's testimony at trial was obviously not cut to fit that of the other witnesses he saw"). We therefore conclude the prosecutor's mistake did not rise to plain error.

IV.

Lastly, we address defendant's excessive sentencing argument. At sentencing, the trial court found aggravating factors one, N.J.S.A. 2C:44-1(a)(1) (the nature and circumstances of the offense); three, N.J.S.A. 2C:44-1(a)(3) (the risk of re-offense); and nine, N.J.S.A. 2C:44-1(a)(9) (general and specific deterrence), outweighed mitigating factor twelve, N.J.S.A. 2C:44-1(b)(12) (cooperation with law enforcement). Defendant challenges the court's assessment of aggravating factors one and three. Acknowledging mitigating factor fourteen, N.J.S.A. 2C:44-1(a)(14) ("[t]he defendant was under 26 years of age at the time of the commission of the offense"), was enacted after the incident occurred, defendant nonetheless argues the court failed to consider his youth at the time of the offense. Defendant's contentions are unavailing.

Sentencing determinations are reviewed on appeal with a highly deferential standard. State v. Fuentes, 217 N.J. 57, 70 (2014). "The appellate court must affirm the sentence unless (1) the sentencing guidelines were

violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) 'the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience.'" Ibid. (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)). Once the trial court has balanced the aggravating and mitigating factors set forth in N.J.S.A. 2C:44-1(a) and (b), it "may impose a term within the permissible range for the offense." State v. Bieniek, 200 N.J. 601, 608 (2010); see also State v. Case, 220 N.J. 49, 65 (2014) (instructing that appellate courts may not substitute their judgment for that of the sentencing court, provided that the "aggravating and mitigating factors are identified [and] supported by competent, credible evidence in the record").

## A. Aggravating Factor One

Aggravating factor one "must be premised upon factors independent of the elements of the crime and firmly grounded in the record." Fuentes, 217 N.J. at 63. Aggravating factor one not only requires consideration of "[t]he nature and circumstances of the offense," but also "the role of the actor" therein, "including whether or not it was committed in an especially heinous, cruel, or depraved manner." N.J.S.A. 2C:44-1(a)(1). "In appropriate cases, a sentencing

court may justify the application of aggravating factor one, without double-counting, by reference to the extraordinary brutality involved in an offense." Fuentes, 217 N.J. at 75; see also State v. Soto, 340 N.J. Super. 47, 71-72 (App. Div. 2001) (applying factor one in an aggravated manslaughter and felony murder case where the defendant brutally and viciously attacked the victim).

Citing our Supreme Court's decision in State v. Lawless, 214 N.J. 594 (2013), the trial court in the present matter found and assigned "some weight" to aggravating factor one based not on defendant's conduct toward Smutz, but rather in view of the psychological harm suffered by Palmiotto during commission of the offense. In Lawless, the Court addressed, as a matter of first impression, whether a sentencing judge "may consider the harm suffered by individuals who were physically injured by the defendant's conduct but were not the victims of the offense of which the defendant was convicted." Id. at 600. While driving under the influence, the defendant struck a motor vehicle, killing the victim-driver and seriously injuring his wife- and daughter-passengers. Id. at 601-02. The Court held such injuries may be considered "as part of the 'nature and circumstances of the offense' inquiry authorized by N.J.S.A. 2C:44-1(a)." Id. at 615.

Notably, the Court recognized under the Crime Victim's Bill of Rights, N.J.S.A. 52:4B-34 to -38:

> "[V]ictim" means a person who suffers personal, physical or psychological injury or death or incurs loss of or injury to personal or real property as a result of a crime committed by an adult or an act of delinquency that would constitute a crime if committed by an adult, committed against that person. "Victim" also includes the nearest relative of the victim of a criminal homicide.
>
> [Id. at 614 (emphasis added).]

Here, defendant claims the court's aggravating factor one finding is not supported by the record. However, the court explicitly found defendant's conduct placed Palmiotto "in the middle of th[e] struggle with a gun being pointed and ultimately being [fired]." Further, her "eyeglasses were broken during the course of th[e] struggle." The record amply supports the court's finding. See State v. Miller, 205 N.J. 109, 127 (2011).

Indeed, Palmiotto – who was nineteen years old at the time of the incident and had never seen a handgun – testified she was scared and shocked when she saw defendant pointing a gun at Smutz. Further, the melee occurred in the sanctity of Palmiotto's home, she attempted to revive Smutz after he was shot in their home, and she had "anxiety attacks" after learning Smutz had died from

20

his injuries. We therefore discern no reason to disturb the court's aggravating factor one finding.

## B. Aggravating Factor Three

We have previously warned against the use of a defendant's refusal to admit guilt to increase a sentence. See State v. Marks, 201 N.J. Super. 514, 540 (App. Div. 1985) (noting our "view that a defendant's refusal to acknowledge guilt following a conviction is generally not a germane factor in the sentencing decision"). In State v. Carey, 168 N.J. 413 (2001), however, our Supreme Court recognized a sentencing court may consider the defendant's failure to take responsibility in support of aggravating factor three. In Carey, the Court upheld the sentencing judge's finding of aggravating factor three where the defendant "expresse[d] remorse, but [did] not directly accept responsibility for the [car] crash or admit that he ha[d] a problem of drinking and driving." Id. at 426-27.

Here, at first blush, the court's finding that defendant's denial of responsibility and lack of remorse constituted "a huge factor in the . . . risk of reoffending" gives us pause. However, in its consideration of aggravating factor three, the court properly considered defendant's juvenile record, which commenced at age nine and continued until he was eighteen, with an adjudication for aggravated assault on a school employee. The court also

21

considered defendant violated probation as a juvenile offender. As the court correctly determined, although defendant had no prior criminal record, his juvenile record gave rise to a risk of re-offense. We therefore discern no reason to disturb the court's aggravating factor three finding.

## C. Defendant's Youth

Little need be said regarding defendant's argument that the court failed to consider his youth. Notably, defendant does not argue mitigating factor fourteen applies retroactively. See State v. Lane, 251 N.J. 84, 87 (2022) (holding mitigating factor fourteen applies prospectively).

Instead, defendant argues the developmental science concluding youthful offenders are more likely to engage in reckless acts, adopted by federal and state courts in certain circumstances involving juvenile offenders, should apply with equal force to his acts as a nineteen-year-old offender. See, e.g., Roper v. Simmons, 543 U.S. 551, 568 (2005) (eliminating the death penalty for juvenile offenders); Miller v. Alabama, 567 U.S. 460, 479-80 (2012) (prohibiting mandatory life imprisonment sentencing schemes for juvenile offenders, but leaving open the possibility of such sentences in homicide cases provided the mitigating effect of the defendant's age is properly considered); State v. Zuber, 227 N.J. 422, 446-47 (2017) (applying the Miller factors "to a sentence that is

the practical equivalent of life without parole"); <u>State v. Comer</u>, 249 N.J. 359, 401 (2022) (permitting juvenile offenders to seek a resentencing hearing after serving a least twenty years' imprisonment).

However, we recently rejected a similar argument raised by three separate defendants, who were between the ages of eighteen and twenty when they committed murder and were sentenced to life imprisonment. <u>See</u> <u>State v. Jones</u>, 478 N.J. Super. 532 (App. Div. 2024) (declining to extend the Court's holding in <u>Comer</u> to adult youthful offenders). Moreover, in its assessment of defendant's juvenile record under aggravating factor three, the court expressly considered defendant was "a younger male."

Affirmed, but remanded for issuance of an amended JOC. Jurisdiction is not retained.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2581-21